JUDGE CROTTY.

**08 CV 02950**

UNITED STATES DISTRICT COURT

FOR THE

SOUTHERN DISTRICT OF NEW YORK

RECEIVED

MAR 2 0 2008

U.S.D.C. S.D N.Y.
CASHIERS

| | |
|---|---|
| LISA VIONI and HEDGE CONNECTION INC., | : |
| Plaintiffs, | : Civil Action Nos. : 08-cv- _____ (___) |
| v. | : |
| AMERICAN CAPITAL STRATEGIES, LTD., PROVIDENCE INVESTMENT MANAGEMENT, LLC, PROVIDENCE INVESTMENT PARTNERS, LLC, And RUSSELL JEFFREY, | : JURY TRIAL DEMANDED |
| Defendants. | : |

## COMPLAINT

LISA VIONI and HEDGE CONNECTION INC, plaintiffs, by their attorneys Carey & Associates LLC, bring this civil action against defendants AMERICAN CAPITAL STRATEGIES, LTD. (**"CAPITAL"** or **"ACSL"**), PROVIDENCE INVESTMENT MANAGEMENT, LLC (**"PROVIDENCE MANAGEMENT"**), PROVIDENCE INVESTMENT PARTNERS, LLC (**"PROVIDENCE PARTNERS"**) (PROVIDENCE MANAGEMENT and PROVIDENCE PARTNERS are collectively **"PROVIDENCE"**), and RUSSELL JEFFREY (**"JEFFREY"**), and respectfully allege the following upon information and belief:

### SUMMARY STATEMENT OF THE FACTS

1.   Over a period of approximately 10 months in 2006 and 2007:

   a)   JEFFREY and PROVIDENCE, and later CAPITAL, retained the services of Vioni to introduce each to a viable business partner,

b)   Vioni introduced CAPITAL and JEFFREY/PROVIDENCE to
     each other,

c)   CAPITAL absorbed JEFFREY, PROVIDENCE and each employee
     of PROVIDENCE,

d)   CAPITAL built its financial services with the
     employees of PROVIDENCE, and

e)   Each defendant dishonored its contract to compensate
     Vioni.

## JURISDICTION AND VENUE

2.   The Court has diversity jurisdiction of this matter

pursuant to Title 28, United States Code, Section 1332(a), as

plaintiffs are citizens of different states from defendants and

the amount in controversy exceeds $75,000, exclusive of

interests and costs.

3.   Venue is proper in this judicial district, pursuant to 28

U.S.C. § 1391(a)(2), since a substantial part of the events or

omissions giving rise to the claim occurred in this judicial

district.

## PARTIES

**A.   PLAINTIFFS**

4.   Lisa Vioni is a citizen of the State of Florida.

5.   Vioni introduced defendant CAPITAL to defendants PROVIDENCE

and JEFFREY and introduced the latter to CAPITAL.

6.   Hedge Connection Inc. ("**HCI**") is a corporation formed under

the laws of the State of Florida on May 3, 2005. It has its

headquarters and principal place of business in Florida and is

wholly owned by Lisa Vioni.

7.   Vioni, individually, took the actions alleged in this complaint.

8.   In certain instances, Vioni sent and received e-mail using the HCI internet domain name.

9.   In certain instances, Vioni signed her e-mail using HCI as her address.

10.  HCI is named as a plaintiff in the alternative, in the event that the facts establish that HCI is also a party in interest.

**B.   DEFENDANT AMERICAN CAPITAL STRATEGIES, LTD.**

11.  CAPITAL is a publicly traded regulated investment corporation. Its stock trades on the Nasdaq market under the symbol "ACAS."

12.  CAPITAL was incorporated under the laws of the State of Delaware on February 10, 1986. It has its headquarters and principal place of business in Maryland.

13.  CAPITAL also has offices at 505 Fifth Avenue, New York, New York. In addition, CAPITAL has offices in Boston, Philadelphia, Dallas, Los Angeles, Palo Alto, San Francisco, and Chicago. In Europe, it has offices in London, Paris, Madrid and Frankfurt.

14.  At all times material to this complaint, CAPITAL was in the global asset management business. CAPITAL is an investor in management and employee buyouts, private equity buyouts and

early stage and mature private and public companies. As of
September 30, 2007, CAPITAL had approximately $17 billion of
assets under management.

15.   At all times material to this complaint, in its dealings
with Vioni, CAPITAL acted primarily through Robert K. Grunewald,
Managing Director, Financial Services Group.

### 1.   American Capital Agency Corp.

16.   CAPITAL incorporated American Capital Agency Corp. in the
State of Delaware on January 7, 2008 (**"AGENCY"**).

17.   AGENCY has its headquarters and principal place of business
in Maryland.

18.   CAPITAL formed AGENCY to invest exclusively in single-
family residential mortgage pass-through securities and
Collateralized Mortgage Obligations (**"CMOs"**) for which the
principal and interest payments are guaranteed by a U.S.
Government agency or a U.S. Government-sponsored entity.

19.   AGENCY will elect to be taxed, and intends to qualify, as a
Real Estate Investment Trust (**"REIT"**) for federal income tax
purposes.

20.   Shares in AGENCY will be sold to the public through an
initial public offering.

21.   Simultaneously with the completion of the offering, CAPITAL
will purchase in a private placement a minimum of $50 million of

the common stock of AGENCY at the initial public offering price.

22.  AGENCY will commence business upon completion of the offering.

23.  AGENCY will have no employees.

24.  JEFFREY is a Senior Vice President of AGENCY.

### 2.  American Capital Management LLC

25.  American Capital Management LLC (**"MANAGEMENT"**) is wholly owned by CAPITAL through a subsidiary of CAPITAL, American Capital, LLC, a wholly owned portfolio company.

26.  MANAGEMENT was incorporated under the laws of the State of Delaware on May 16, 2002.

27.  MANAGEMENT has its headquarters and principal place of business in Maryland.

28.  MANAGEMENT will manage AGENCY.

29.  JEFFREY and two former employees of PROVIDENCE are officers of MANAGEMENT.

30.  MANAGEMENT will have no employees.

31.  MANAGEMENT will enter into an administrative services agreement with CAPITAL, or an affiliate that has access to CAPITAL'S resources, pursuant to which MANAGEMENT will have access to CAPITAL's employees, infrastructure, business relationships, management expertise, and capital raising

capabilities.

## C.   DEFENDANTS PROVIDENCE INVESTMENT MANAGEMENT LLC, PROVIDENCE INVESTMENT PARTNERS, LLC AND JEFFREY

### 1.   PROVIDENCE INVESTMENT MANAGEMENT LLC

32.   PROVIDENCE MANAGEMENT was formed under the laws of the State of Delaware on November 20, 2003.

33.   PROVIDENCE MANAGEMENT had its headquarters and principal place of business, at all times material to this complaint, at 76 Westminster Street, Suite 1400, Providence, Rhode Island.

34.   PROVIDENCE MANAGEMENT was a nine-employee investment management company.

35.   PROVIDENCE MANAGEMENT managed and planned to manage Mortgage-Backed Securities (MBS) and Structured Finance and Credit Focused Hedge Funds, and a Mortgage-Backed Securities Real Estate Investment Trust.

36.   In late 2007, PROVIDENCE MANAGEMENT projected it would have $1.6 Billion in assets under management.

### 2.   PROVIDENCE INVESTMENT PARTNERS, LLC

37.   Providence Investment Partners, LLC was formed under the laws of the State of Delaware on December 15, 2006.

38.   PROVIDENCE PARTNERS was registered to do business in Rhode Island on April 27, 2007.

39.   PROVIDENCE PARTNERS has its principal place of business at 76 Westminster Street, Suite 1400, Providence, Rhode Island.

- 6 -

40.   PROVIDENCE PARTNERS owns and controls PROVIDENCE
MANAGEMENT.

41.   PROVIDENCE MANAGEMENT owns and controls PROVIDENCE
PARTNERS.

42.   CAPITAL entered into transactions known and unknown with
PROVIDENCE MANAGEMENT, PROVIDENCE PARTNERS or both.

### 3.   RUSSELL JEFFREY

43.   JEFFREY was at all times material to this complaint a
resident of the State of Rhode Island.

44.   PROVIDENCE MANAGEMENT employed JEFFREY as Chief Executive
Officer and Chief Investment Strategist.

45.   JEFFREY was the majority owner and a managing member of
PROVIDENCE MANAGEMENT.

46.   At all times material to this complaint, in its dealings
with Vioni, PROVIDENCE MANAGEMENT acted primarily through
JEFFREY.

47.   JEFFREY is the manager of PROVIDENCE PARTNERS.

48.   At all times material to this complaint, in its dealings
with Vioni, PROVIDENCE PARTNERS acted primarily through JEFFREY.

49.   At all times material to this complaint, in his dealings
with Vioni, JEFFREY also acted in his individual interest.

50.   At the time of his employment by CAPITAL, on behalf of

himself and PROVIDENCE, JEFFREY agreed with CAPITAL:

    a)    That PROVIDENCE would not make certain investments,

    b)    That JEFFREY would devote his full-time attention and
         energies to his employment with CAPITAL,

    c)    That JEFFREY was entitled to continue to provide
         services to PROVIDENCE and to investment vehicles
         managed by PROVIDENCE, as long as his activities did
         not detract significantly from his work on behalf of
         CAPITAL, and

    d)    That during his employment by CAPITAL, JEFFREY would
         cause all management fees earned by PROVIDENCE to be
         assigned to CAPITAL or its designee.

51.    JEFFREY is a Senior Vice President and Managing Director of

CAPITAL; a Senior Vice President of AGENCY; and Chief Investment

Officer and a Vice President of MANAGEMENT.

<strong>DETAILED STATEMENT OF FACTS</strong>

**A.    CAPITAL AND JEFFREY/PROVIDENCE CONTRACT FOR VIONI'S
      SERVICES**

52.    On November 14, 2006, Robert Grunewald, Managing Director

of CAPITAL, met with Vioni at CAPITAL's offices in New York City

to discuss the expansion of the financial services CAPITAL

offered.

53.    At the November 14 meeting, Grunewald expressed a desire to

grow CAPITAL's financial services business by means of investing

in hedge funds.

54.    At the November 14 meeting, Grunewald said that CAPITAL

would potentially sell the hedge funds to the public.

55.    Grunewald said to Vioni in his telephone conversation to

set up the November 14 meeting that CAPITAL could not internally raise the monies needed for investment in the hedge funds.

56.    During November 2006, at the request of Jeffrey and PROVIDENCE, Vioni introduced JEFFREY and PROVIDENCE to investors other than CAPITAL to enable PROVIDENCE to expand its business and to attract additional resources.

57.    Between October 2006 and September 2007, CAPITAL contracted with Vioni in writing to compensate her for her efforts in introducing the company to one or more persons or entities that would further CAPITAL's goal.

58.    Between October 2006 and September 2007, JEFFREY and PROVIDENCE contracted with Vioni in writing to compensate her for her efforts in introducing the company to one or more persons or entities that would further JEFFREY's and PROVIDENCE's goal.

**B.    VIONI INTRODUCES CAPITAL AND JEFFREY/PROVIDENCE**
59.    In April 2007, acting as a Finder for CAPITAL, at the request of Robert Grunewald, Vioni introduced Grunewald and CAPITAL to JEFFREY and PROVIDENCE.

60.    In April 2007, acting as a Finder for JEFFREY and PROVIDENCE, Vioni introduced JEFFREY to Grunewald and CAPITAL.

61.    In e-mails dated April 4, 2007, JEFFREY confirmed that he wanted Vioni to introduce him and PROVIDENCE to CAPITAL.

62.   In e-mails dated April 4 and 9, 2007, Grunewald confirmed
that he wanted Vioni to introduce him to a specialist in
managing investments in mortgage-backed securities.

63.   Vioni, Grunewald and JEFFREY spoke by telephone on April
13, 2007 and arranged to meet on Wednesday April 18, 2007.

64.   On April 18, 2007, Vioni introduced JEFFREY and Grunewald
to each other at a meeting in New York City.

65.   Outside the April 18, 2007 meeting, in the presence of
Vioni, Grunewald told JEFFREY that CAPITAL wanted to buy
PROVIDENCE, subject to a due diligence examination.

66.   Outside the April 18, 2007 meeting, in the presence of
Vioni and JEFFREY, Grunewald acknowledged that Vioni would be
paid and raised the issue how Vioni would be paid on an unending
access to capital.

67.   In e-mails dated April 19, 2007, Vioni and JEFFREY
confirmed the latter's statement that Vioni would be paid for
her services for introducing JEFFREY, PROVIDENCE and CAPITAL to
each other.

68.   In e-mails dated April 19, 2007, JEFFREY and Vioni
confirmed that Vioni would be paid for her services for monies
invested in funds managed by JEFFREY calculated on the future
growth of the funds.

69.   In an e-mail dated April 19, 2007, in response to

- 10 -

Grunewald's April 18 e-mail, Vioni confirmed to Grunewald CAPITAL's interest in having the PROVIDENCE employees joining CAPITAL.

70.  In an e-mail dated April 20, 2007, Grunewald confirmed to Vioni that Vioni would be paid by CAPITAL for her services, with details of payment dependent on the final structure of the transactions.

71.  On April 20, 2007, JEFFREY and Vioni met in New York City and discussed the combination of JEFFREY and PROVIDENCE with CAPITAL.

72.  On April 22, 2007, Vioni advised Grunewald by e-mail of her meeting with JEFFREY on April 20.

73.  On April 22, 2007, Vioni advised Grunewald by e-mail that JEFFREY would advise a potential investor in PROVIDENCE to make its investment of $100 million in a new hedge fund to be managed by CAPITAL.

**C.   CAPITAL MAKES AN OFFER TO JEFFREY AND PROVIDENCE**

74.  Grunewald asked Vioni, in an e-mail dated April 22, 2007, to determine what compensation package JEFFREY required.

75.  Grunewald confirmed, in an e-mail dated April 23, 2007, that Vioni would be paid in relation to PROVIDENCE, with details of the payment dependent on the final structure of the transactions.

76.   On April 24, 2007, as the result of the introduction of JEFFREY to Grunewald by Vioni, JEFFREY had dinner in Boston with the Chief Financial Officer and others from CAPITAL.

77.   JEFFREY confirmed, by e-mail dated April 25, 2007, that the Chief Financial Officer of CAPITAL was in the offices of PROVIDENCE that day.

78.   On April 27, 2007, JEFFREY caused PROVIDENCE PARTNERS to be registered to do business in Rhode Island.

79.   As a result of the introductions made by Vioni, defendants planned that CAPITAL and its affiliates would enter into, and they did enter into, transactions, among other transactions known and unknown, with PROVIDENCE, JEFFREY, the employees of PROVIDENCE, investors in PROVIDENCE, trusts and funds managed by PROVIDENCE, and with potential investors in trusts and funds managed by PROVIDENCE. (collectively **"ACSL Transactions"**).

80.   On May 7, 2007, CAPITAL's Investment Committee looked favorably on the proposal to enter into the ACSL Transactions.

81.   On May 8, 2007, Vioni and Grunewald discussed CAPITAL creating a hedge fund that would invest only in mortgage-backed securities.

82.   In e-mails dated May 14, 2007, JEFFREY and Vioni confirmed that she would be paid in relation to the ACSL Transactions.

83.   In an e-mail to JEFFREY dated May 14, 2007, Vioni repeated

- 12 -

that the details of the payment for her services would be determined when the structure of the ACSL Transactions were known.

84.  JEFFREY and Grunewald discussed mortgage-backed securities at dinner in New York City on May 21, 2007.

85.  JEFFREY was informed for the first time on May 31, 2007 that he had a deal with CAPITAL and reported that to Vioni by e-mail.

86.  On June 14, 2007, JEFFREY and Vioni exchanged proposals related to the structure of the ACSL Transactions.

87.  On June 18, 2007, JEFFREY stated that he and Grunewald agreed that the ACSL transactions were a direct result of the introduction by Vioni.

88.  On June 18, 2007, JEFFREY stated that Vioni should be paid according to industry standards.

89.  On June 18, 2007, JEFFREY stated that Grunewald often said that Vioni added a lot of value and should be paid a substantial amount for the introductions related to the ACSL Transactions.

90.  Vioni told Grunewald by e-mail dated June 22, 2007 that they should talk when the negotiations with JEFFREY were final.

91.  Grunewald told Vioni on June 25, 2007, that CAPITAL was examining how to calculate the Finder Fees that will be owed to

Vioni for the introduction of CAPITAL to JEFFREY and PROVIDENCE.

92.   On July 17, 2007, in an e-mail, Grunewald stated a) that
Vioni introduced the employees of PROVIDENCE; b) that CAPITAL
paid fees for recruiting employees; c)that Vioni introduced
JEFFREY to CAPITAL; d) that the introduction of JEFFREY and
PROVIDENCE was expected to lead to profit based on management
fees received by CAPITAL ; e) that the introduction made it
likely that CAPITAL could now create a new mortgage-backed
securities hedge fund; f) that Vioni should be paid for making
the introduction; and g) that CAPITAL would defer to JEFFREY
regarding fees to be paid to Vioni related to money raised and
to be raised.

93.   Grunewald told Vioni at a meeting at CAPITAL's Maryland
office on July 25, 2007 that Vioni would be paid for her
services.

## D.    CAPITAL ABSORBS JEFFREY/PROVIDENCE AND HIRES EACH EMPLOYEE OF PROVIDENCE

94.   By August 15, 2007, CAPITAL had made an offer to hire each
employee of PROVIDENCE.

95.   On August 15, 2007, JEFFREY informed Vioni that he and
Grunewald had agreed that she would be paid a fee for the
introduction of JEFFREY and PROVIDENCE to CAPITAL.

96.   By August 15, 2007, CAPITAL had agreed to invest $100
million in the new Residential Mortgage-Backed Securities hedge

fund to be managed by JEFFREY at CAPITAL, starting with $20 million.

97.  After JEFFREY received his copy of the ACSL Transactions documents, in August 2007, he told Vioni that CAPITAL agreed to pay fees to the funds on the money it invested in funds managed by JEFFREY.

98.  On August 15, 2007, Grunewald told Vioni that CAPITAL would pay 2% and 20% fees on the money it invested in the hedge fund.

99.  JEFFREY also informed Vioni on August 15, 2007 that he and Grunewald had agreed that she would be paid a fee on the money invested into the new hedge fund to be created by CAPITAL.

100. CAPITAL agreed to name Vioni or HCI in its press release as being responsible for the introduction of CAPITAL to PROVIDENCE and JEFFREY.

101. On August 16, 2007, Vioni wrote Grunewald asking him to provide her with a copy of the ACSL Transactions documents.

102. As a result of the introductions made by Vioni, JEFFREY and PROVIDENCE transferred to CAPITAL, and to affiliates and funds controlled by CAPITAL, monies previously invested in hedge funds managed by PROVIDENCE.

103. As a result of the introductions made by Vioni, JEFFREY and PROVIDENCE caused potential investors in PROVIDENCE managed funds to transfer monies to CAPITAL, and to affiliates and funds

- 15 -

managed and controlled by CAPITAL.

104. As a result of the introductions made by Vioni, in September 2007, CAPITAL and its affiliates hired each employee of PROVIDENCE, including JEFFREY (collectively "**Providence Investment Team**").

105. As a result of the introductions made by Vioni, PROVIDENCE facilitated the hiring of the Providence Investment Team by CAPITAL and its affiliates.

106. JEFFREY and the other employees of PROVIDENCE were employed by CAPITAL or an affiliate of CAPITAL.

107. CAPITAL hired JEFFREY as head of its eight-member Residential Mortgage-Backed Securities investment team and as Chief Investment Officer.

108. CAPITAL hired the employees of PROVIDENCE in order to pursue various investment strategies including investments in Residential Mortgage-Backed Securities.

109. The successful implementation of the investment and financing strategies of CAPITAL and AGENCY depended to a significant extent upon JEFFREY.

110. CAPITAL expected JEFFREY and the Providence Investment Team to be a differentiating competitive advantage relative to its competitors.

111. CAPITAL expected JEFFREY and the Providence Investment Team to provide services to AGENCY, MANAGEMENT, CAPITAL and other Residential Mortgage-Backed Securities investment vehicles that have been or may be sponsored by CAPITAL.

112. In September 2007, through terms of the employment agreement between JEFFREY and CAPITAL and between CAPITAL and the other PROVIDENCE employees it hired, CAPITAL:

   a)   Acquired the management fee income of PROVIDENCE,

   b)   Restricted the types of investments that could be made by PROVIDENCE,

   c)   Acquired as employees JEFFREY and all the other experienced employees of PROVIDENCE,

   d)   Acquired the fulltime attention and energies of JEFFREY, and

   e)   Acquired the track record, of PROVIDENCE, JEFFREY and of the Providence Investment Team, for successful investment management including management of investments in mortgage-backed securities.

113. In September 2007, by making the above agreements and acquisitions, CAPITAL acquired the human assets and management income of PROVIDENCE.

114. In September 2007, CAPITAL's agreement with JEFFREY prevented PROVIDENCE from investing in certain financial products.

115. In September 2007, CAPITAL materially limited the ability of JEFFREY to work with PROVIDENCE.

116. As a result of the introductions made by Vioni, in

- 17 -

September 2007 and afterwards, PROVIDENCE facilitated the transfer of hedge funds and trusts and monies from PROVIDENCE to CAPITAL and its affiliates.

117. As a result of the introductions made by Vioni, in September 2007 and afterwards, JEFFREY and PROVIDENCE persuaded investors and potential investors to invest in hedge funds, trusts and other financial instruments, known and unknown, managed or under the direct and indirect control of PROVIDENCE, and of CAPITAL and its affiliates.

118. As a result of the ACSL Transactions, PROVIDENCE ceased to operate in all material respects as it had operated prior to such transactions.

119. The ACSL Transactions combined PROVIDENCE, its customers, prospective customers, and their investments, and the Providence Investment Team with CAPITAL and its affiliates, and the related funds and trusts to be managed by the Providence Investment Team.

**E.   CAPITAL BUILDS ITS FINANCIAL SERVICES WITH PROVIDENCE AND THE PROVIDENCE INVESTMENT TEAM**

120. In October 2007, CAPITAL and its affiliates invested approximately $29 Million in an investment vehicle managed by the Providence Investment Team that employs a credit-sensitive Residential Mortgage-Backed Securities ("**RMBS**") or other investment strategy.

121. As a result of the introductions made by Vioni, in January 2008, CAPITAL incorporated American Capital Agency Corp.

122. CAPITAL formed AGENCY as a Real Estate Investment Trust to be managed under the supervision of JEFFREY.

123. CAPITAL formed AGENCY as a Real Estate Investment Trust with the express purpose of investing in Residential Mortgage-Backed Securities.

124. CAPITAL invested or will invest a minimum of $50 million in AGENCY upon its initial public offering as part of a sale intended to raise an additional $350 million.

125. CAPITAL will have the Providence Investment Team manage the $400 million invested in AGENCY.

126. CAPITAL and the Providence Investment Team have raised and intend to raise additional millions of dollars to be managed by the Providence Investment Team.

**F. CAPITAL AND JEFFREY/PROVIDENCE EACH DISHONOR ITS AGREEMENT TO COMPENSATE VIONI**

127. On August 16, 2007, Vioni wrote Grunewald asking him to provide her with a copy of the documents that detailed the structure of the ACSL Transactions.

128. By letter dated November 30, 2007, Vioni requested that PROVIDENCE, JEFFREY and CAPITAL provide her with copies of the documents that detailed the structure of the ACSL Transactions.

129. CAPITAL, PROVIDENCE and JEFFREY provided no documents to Vioni related to the completed ACSL Transactions.

130. CAPITAL, PROVIDENCE and JEFFREY paid nothing to HCI or to Vioni for the introductions Vioni made that resulted in the ACSL Transactions.

131. CAPITAL, PROVIDENCE and JEFFREY paid nothing to HCI or to Vioni for the other services Vioni provided that resulted in the ACSL Transactions.

132. Regulations may have required Vioni to register as a representative with a broker-dealer at the time payments were due to her from defendants, depending on the nature of the transaction.

133. Vioni did not register when it was clear that defendants would default in making payment for her services.

134. Vioni can and will become registered as required.

**FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT BY CAPITAL**

135. Plaintiffs re-allege paragraphs 52 through 134 as though fully set forth here.

136. Between October 2006 and September 2007, defendant CAPITAL entered into a contract with Vioni and HCI to introduce to CAPITAL persons and entities to help CAPITAL grow its business.

137. Pursuant to the terms of the Contract, among other services

plaintiffs, directly and indirectly:

    a)    Introduced CAPITAL to PROVIDENCE and JEFFREY and introduced the latter to CAPITAL,

    b)    Introduced CAPITAL to each employee of PROVIDENCE and introduced the latter to CAPITAL,

    c)    Introduced CAPITAL to investors in funds managed by PROVIDENCE and introduced the latter to CAPITAL, and

    d)    Introduced CAPITAL to investors who planned to invest through PROVIDENCE and introduced the latter to CAPITAL.

138. As a result of such introductions, plaintiffs enabled and were directly and indirectly responsible for the following, among other transactions:

    a)    CAPITAL acquired the services, experience and expertise of the Providence Investment Team as well as the track record of the Providence Investment Team,

    b)    PROVIDENCE transferred to CAPITAL investments previously managed by PROVIDENCE,

    c)    PROVIDENCE caused prospective investors to transfer to CAPITAL investments previously planned to be management by PROVIDENCE,

    d)    CAPITAL sold the services of the Providence Investment Team based on its track record in managing Mortgage-Backed Securities hedge funds,

    e)    CAPITAL and its affiliates invested $29 million in a fund managed by JEFFREY for CAPITAL and its affiliates,

    f)    CAPITAL formed AGENCY and registered its prospectus to make and made an initial public offering of its stock for $400 million to be invested in a Real Estate Investment Trust,

    g)    CAPITAL sold the Real Estate Investment Trust to the public by highlighting its investment of a minimum of $50 million in AGENCY as part of the $400 million to be raised,

    h)    CAPITAL sold and will sell one or more Real Estate Investment Trusts and other funds to the public by

promoting that the Providence Investment Team would
manage the REIT or fund for CAPITAL,

i)   AGENCY attracted investors including CAPITAL to invest
     in the $400 million Initial Public Offering;

j)   CAPITAL collected and will collect management fees and
     performance fees paid for managing monies invested in
     one or more Real Estate Investment Trusts and in other
     funds, and

k)   CAPITAL will collect management fees paid for managing
     monies, if any, still invested in REITs and funds
     managed by PROVIDENCE after the ACSL Transactions.

139. Plaintiffs were the sole procuring cause of the ACSL

Transactions.

140. Plaintiffs fully performed under the terms of the contract.

141. Pursuant to the contract, CAPITAL agreed to pay plaintiffs

for their services.

142. Pursuant to the contract, CAPITAL agreed to pay plaintiffs

amounts dependent on the final structure of the ACSL

Transactions.

143. CAPITAL has not paid plaintiffs for their services.

144. CAPITAL has concealed from plaintiffs the information

plaintiffs need to determine the amount of the payment owed to

them.

145. CAPITAL owes plaintiffs the following fees, among others:

a)   A Finders' Fee for the introduction of CAPITAL to
     JEFFREY and PROVIDENCE,

b)   A fee for the acquisition and hiring of the entire
     Providence Investment Team, and for the investments
     transferred from PROVIDENCE funds and from prospective

investors in PROVIDENCE managed funds (**"Lift-Out Fee"**),

c)    Marketing Fees for the monies invested as the direct and indirect result of the transactions between PROVIDENCE, JEFFREY, investors and prospective investors in Real Estate Investment Trusts and funds managed and to be managed, in part, by JEFFREY for CAPITAL, including the full value of the monies in the AGENCY REIT (**"Jeffrey Funds"**),

d)    A percentage of the management fees received by CAPITAL related to the Jeffrey Funds, for each year until such funds are fully liquidated or redeemed, and

e)    A percentage of the performance fees received by CAPITAL related to the Jeffrey Funds, for each year until such funds are fully liquidated or redeemed.

146. CAPITAL owes plaintiffs fees calculated on the basis of the value of each of the benefits received by CAPITAL as a direct and indirect result of the introductions by plaintiffs.

147. As a result of the breach of contract by CAPITAL, CAPITAL has damaged plaintiffs in an amount to be determined at trial, believed to be in excess of $15,000,000.

### SECOND CAUSE OF ACTION
### QUANTUM MERUIT - CAPITAL

148. Plaintiffs re-allege paragraphs 52 through 134 and 136 through 146 as though fully set forth here.

149. Plaintiffs performed work, labor and services that Vioni provided to CAPITAL, at its request.

150. CAPITAL has not paid plaintiffs for services rendered by Vioni between October 1, 2006 and September 30, 2007.

151. CAPITAL has concealed from plaintiffs the information plaintiffs need to determine the amount of the payment owed to them.

152. The reasonable value of the services for which CAPITAL has not made payment is to be determined at trial but is believed to be in excess of $15,000,000.

153. As a result of the breach by CAPITAL, CAPITAL has damaged plaintiffs in an amount to be determined at trial, believed to be in excess of $15,000,000.

### THIRD CAUSE OF ACTION
### BREACH OF LIFT-OUT CONTRACT BY CAPITAL

154. Plaintiffs re-allege paragraphs 52 through 134 and 136 through 146 as though fully set forth here.

155. CAPITAL retained plaintiffs to enable CAPITAL to hire JEFFREY and each employee of PROVIDENCE.

156. CAPITAL retained plaintiffs to enable CAPITAL to acquire investments made in funds managed by PROVIDENCE.

157. CAPITAL retained plaintiffs to enable CAPITAL to acquire investments previously being considered for management by PROVIDENCE.

158. Plaintiffs performed each service that they were retained to perform for CAPITAL ("**Lift-out Services**").

159. As a result of the Lift-out Services performed by

plaintiffs, CAPITAL hired JEFFREY and each other employee of PROVIDENCE.

160. As a result of the Lift-out Services performed by plaintiffs, investments managed by PROVIDENCE were transferred to CAPITAL.

161. As a result of the Lift-out Services performed by plaintiffs, investments previously being considered for management by PROVIDENCE were made in funds managed by CAPITAL.

162. CAPITAL agreed to pay plaintiffs industry standard fees for their Lift-out Services (**"Lift-out Fees"**).

163. The industry standard fees for Lift-out Services are 33.33% of the value of the related service, as described below.

164. For plaintiffs' services, for the first year of employment, CAPITAL owes plaintiffs 33.33% of the annual compensation paid to JEFFREY and the former employees of PROVIDENCE.

165. For plaintiffs' services, with respect to investments transferred from PROVIDENCE to CAPITAL and to funds owned and controlled by CAPITAL, for the first year such fees are under management by Capital and its funds, CAPITAL owes plaintiffs 33.33% of the management fees charged by CAPITAL and its funds on the amount of such investment transfers; and 33.33% of the performance fees charged by CAPITAL and its funds on profits made on such investment transfers.

166. For plaintiffs' services, with respect to investments that were previously being considered for management by PROVIDENCE or JEFFREY but were made instead in CAPITAL and its funds, for the first year such fees are under management by Capital and its funds, CAPITAL owes plaintiffs 33.33% of the management fees charged by CAPITAL and its funds on the amount of such investments; and 33.33% of the performance fees charged by CAPITAL and its funds on profits made on such investments.

167. CAPITAL has not paid plaintiffs for their Lift-Out Services.

168. CAPITAL has concealed from plaintiffs the information plaintiffs need to determine the amount of the payment owed to them.

169. As a result of the breach of contract by CAPITAL, CAPITAL has damaged plaintiffs in an amount to be determined at trial, believed to be in excess of $8,000,000.

## FOURTH CAUSE OF ACTION

### QUANTUM MERUIT - CAPITAL - LIFT-OUT CONTRACT

170. Plaintiffs re-allege paragraphs 52 through 134, 136 through 146, and 155 through 168 as though fully set forth here.

171. Plaintiffs performed work, labor and Lift-out Services that were provided to CAPITAL, at its request.

172. CAPITAL has not paid plaintiffs for Lift-out Services

- 26 -

rendered between October 2006 and September 30, 2007.

173. CAPITAL has concealed from plaintiffs the information plaintiffs need to determine the amount of the payment owed to them.

174. The reasonable value of the services for which CAPITAL has not made payment is to be determined at trial but is believed to be in excess of $8,000,000.

175. As a result of the breach by CAPITAL, CAPITAL has damaged plaintiffs in an amount to be determined at trial, believed to be in excess of $8,000,000.

### FIFTH CAUSE OF ACTION
### BREACH OF CONTRACT - JEFFREY & PROVIDENCE

176. Plaintiffs re-allege paragraphs 52 through 134 as though fully set forth here.

177. Between October 2006 and September 2007, defendants JEFFREY and PROVIDENCE entered into a contract to have Vioni and HCI introduce them to persons and entities to help PROVIDENCE grow its business.

178. Pursuant to the terms of the Contract, among other services plaintiffs, directly and indirectly:

   a)   Introduced CAPITAL to PROVIDENCE and JEFFREY and
        introduced the latter to CAPITAL,
   b)   Introduced CAPITAL to each employee of PROVIDENCE and
        introduced the latter to CAPITAL,

c)   Introduced CAPITAL to investors in Real Estate
     Investment Trusts and funds managed by PROVIDENCE and
     introduced the latter to CAPITAL, and

d)   Introduced CAPITAL to investors who planned to invest
     through PROVIDENCE and introduced the latter to
     CAPITAL.

179. As a result of such introductions, plaintiffs enabled and

were directly and indirectly responsible for the following,

among other transactions:

a)   CAPITAL acquired the services, experience and
     expertise of the Providence Investment Team as well as
     the track record of the Providence Investment Team,

b)   PROVIDENCE transferred to CAPITAL investments
     previously managed by PROVIDENCE,

c)   PROVIDENCE caused prospective investors to transfer to
     CAPITAL investments previously planned to be
     management by PROVIDENCE,

d)   CAPITAL sold the services of the Providence Investment
     Team based on its track record in managing Mortgage-
     Backed Securities hedge funds,

e)   CAPITAL and its affiliates invested $29 million in a
     fund managed by JEFFREY for CAPITAL and its
     affiliates,

f)   CAPITAL formed AGENCY and registered its prospectus to
     make and made an initial public offering of its stock
     for $400 million to be invested in a Real Estate
     Investment Trust,

g)   CAPITAL sold the Real Estate Investment Trust to the
     public by highlighting its investment of a minimum of
     $50 million in AGENCY as part of the $400 million to
     be raised,

h)   CAPITAL sold and will sell one or more Real Estate
     Investment Trusts and other funds to the public by
     promoting that the Providence Investment Team would
     manage the fund for CAPITAL,

i)   AGENCY attracted investors including CAPITAL to invest
     in the $400 million Initial Public Offering.

j)   CAPITAL collected and will collect management fees and
     performance fees paid for managing monies invested in

> one or more Real Estate Investment Trusts and in other
> funds. and
>
> k)  CAPITAL will collect management fees paid for managing
>     monies, if any, still invested in funds managed by
>     PROVIDENCE after the ACSL Transactions.

180. Plaintiffs were the sole procuring cause of the ACSL

Transactions.

181. Plaintiffs fully performed under the terms of the contract.

182. Pursuant to the contract, JEFFREY and PROVIDENCE agreed to

pay plaintiffs for their services.

183. Pursuant to the contract, JEFFREY and PROVIDENCE agreed to

pay plaintiffs amounts dependent on the final structure of the

ACSL Transactions.

184. JEFFREY and PROVIDENCE have concealed from plaintiffs the

information plaintiffs need to determine the amount of the

payment owed to them.

185. JEFFREY and PROVIDENCE have not paid plaintiffs for their

services.

186. JEFFREY and PROVIDENCE owe plaintiffs the following fees,

among others:

- a)  A Finders' Fee for the introduction of CAPITAL to
      JEFFREY and PROVIDENCE,
- b)  Marketing Fees for the monies invested as the direct
      and indirect result of the transactions between
      PROVIDENCE, JEFFREY, investors and prospective
      investors in the Jeffrey Funds,

c) A percentage of the management fees received by CAPITAL related to the Jeffrey Funds, for each year until such funds are liquidated or redeemed, and

d) A percentage of the performance fees received by CAPITAL related to the Jeffrey Funds, for each year until such funds are liquidated or redeemed.

187. JEFFREY and PROVIDENCE owe plaintiffs fees calculated on the basis of the value of each of the benefits received by JEFFREY and PROVIDENCE as a direct and indirect result of the introductions by plaintiffs.

188. As a result of the breach of contract by JEFFREY and PROVIDENCE, JEFFREY and PROVIDENCE have damaged plaintiffs in an amount to be determined at trial, believed to be in excess of $15,000,000.

### SIXTH CAUSE OF ACTION
### QUANTUM MERUIT – JEFFREY & PROVIDENCE

189. Plaintiffs re-allege paragraphs 52 through 134 and 177 through 187 as though fully set forth here.

190. Plaintiffs performed work, labor and services that Vioni provided to JEFFREY and PROVIDENCE, at their request.

191. JEFFREY and PROVIDENCE have not paid plaintiffs for services rendered by Vioni between October 1, 2006 and September 30, 2007.

192. JEFFREY and PROVIDENCE have concealed from plaintiffs the information plaintiffs need to determine the amount of the payment owed to them.

193. The reasonable value of the services for which JEFFREY and PROVIDENCE has not made payment is to be determined at trial but is believed to be in excess of $15,000,000.

194. As a result of the breach by JEFFREY and PROVIDENCE, JEFFREY and PROVIDENCE have damaged plaintiffs in an amount to be determined at trial, believed to be in excess of $15,000,000.

## JURY DEMAND

195. Plaintiffs demand trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request the Court enter judgment in their favor and against defendants for the following relief:

a.    On the first and second causes of action, awarding compensatory damages against CAPITAL in an amount to be determined at trial, believed to be in excess of $15,000,000,

b.    On the third and fourth causes of action, awarding compensatory damages against CAPITAL in an amount to be determined at trial, believed to be in excess of $8,000,000,

c.    On the fifth and sixth causes of action, awarding compensatory damages against JEFFREY and PROVIDENCE in an amount to be determined at trial believed to be in excess of $15,000,000,

d.    Awarding pre- and post-judgment interest pursuant to 28 U.S.C. § 1961(a) and N.Y. C.P.L.R. §§ 5001, 5003,

e.    Awarding costs and attorneys' fees in an amount to be determined at trial, and

d.    Awarding such other and further relief, legal or equitable, as the Court may deem just and proper.

Dated:  March 20, 2007
        New York, New York

                        Respectfully submitted,
                        CAREY & ASSOCIATES LLC

                By:     _____
                        Michael Q. Carey
                        521 Fifth Avenue, Suite 3300
                        New York, NY 10175-3399
                        Tel.: 212-758-0076
                        mqc@CareyLitigation.com

                        Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**FOR THE**

**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| LISA VIONI and | : | |
| HEDGE CONNECTION INC., | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. |
| | : | 08-cv- _____ (___) |
| v. | : | |
| | : | |
| AMERICAN CAPITAL STRATEGIES, LTD., | : | |
| PROVIDENCE INVESTMENT MANAGEMENT, LLC, | : | JURY TRIAL DEMANDED |
| PROVIDENCE INVESTMENT PARTNERS, LLC, | : | |
| And RUSSELL JEFFREY, | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT**

CAREY AND ASSOCIATES LLC
Michael Q. Carey
521 Fifth Avenue, Suite 3300
New York, New York 10175-3399
212-758-0076
mqc@careylitigation.com

Attorneys for Plaintiffs