UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

LISA VIONI and HEDGE CONNECTION INC.,

                              Plaintiffs,

          - against –                                 Case No. 08 CV 02950 (PAC)
                                                      (ECF Case)
AMERICAN CAPITAL STRATEGIES, LTD.,
PROVIDENCE INVESTMENT MANAGEMENT,
LLC, PROVIDENCE INVESTMENT PARTNERS,
LLC, and RUSSELL JEFFREY,

                              Defendants.

-------------------------------------------------------------X

### DECLARATION OF STEWART D. AARON IN SUPPORT OF
### DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

I, Stewart D. Aaron, declare under penalty of perjury as follows:

1.      I am a member of the law firm of Arnold & Porter LLP, attorneys for Defendants

American Capital Strategies, Ltd ("ACAS"), Providence Investment Management, LLC

("PIM"), Providence Investment Partners, LLC ("PIP") and Russell Jeffrey ("Jeffrey").

2.      Annexed as Exhibit A is a copy of the Complaint by Lisa Vioni ("Vioni") and

Hedge Connection Inc. ("HCI") against ACAS, PIM, PIP and Jeffrey in this action.

3.      Annexed as Exhibit B is a copy of a website print-out from Defendant HCI's

website at www.hedgeconnection.com.

4.      Annexed as Exhibit C is a copy of an April 19, 2007 email exchange between

Vioni and Jeffrey.

5.      Annexed as Exhibit D is a copy of an April 19, 2007 email exchange between

Vioni and Robert K. Grunewald ("Grunewald").

6.    Annexed as Exhibit E is a copy of an April 23, 2007 email exchange between Vioni and Grunewald, attaching a draft engagement letter prepared by Vioni.

7.    Annexed as Exhibit F is a copy of a May 14, 2007 email exchange between Vioni and Jeffrey.

8.    Annexed as Exhibit G is a copy of a July 17, 2007 email exchange between Vioni and Grunewald.

I hereby declare under the penalty of perjury that the foregoing is true and correct.

Dated: June 24, 2008

_____
STEWART D. AARON

# EXHIBIT A

JUDGE CROTTY

UNITED STATES DISTRICT COURT

FOR THE

SOUTHERN DISTRICT OF NEW YORK

08 CV 02950

LISA VIONI and
HEDGE CONNECTION INC.,

          Plaintiffs,

             v.

AMERICAN CAPITAL STRATEGIES, LTD.,
PROVIDENCE INVESTMENT MANAGEMENT, LLC,
PROVIDENCE INVESTMENT PARTNERS, LLC,
And RUSSELL JEFFREY,

          Defendants.

Civil Action No.
08-cv- \_\_\_\_\_ (\_\_\_)

JURY TRIAL DEMANDED

## COMPLAINT

LISA VIONI and HEDGE CONNECTION INC, plaintiffs, by their attorneys Carey & Associates LLC, bring this civil action against defendants AMERICAN CAPITAL STRATEGIES, LTD. ("CAPITAL" or "ACSL"), PROVIDENCE INVESTMENT MANAGEMENT, LLC ("PROVIDENCE MANAGEMENT"), PROVIDENCE INVESTMENT PARTNERS, LLC ("PROVIDENCE PARTNERS") (PROVIDENCE MANAGEMENT and PROVIDENCE PARTNERS are collectively "PROVIDENCE"), and RUSSELL JEFFREY ("JEFFREY"), and respectfully allege the following upon information and belief:

### SUMMARY STATEMENT OF THE FACTS

1.   Over a period of approximately 10 months in 2006 and 2007:

    a)  JEFFREY and PROVIDENCE, and later CAPITAL, retained the services of Vioni to introduce each to a viable business partner,

b) Vioni introduced CAPITAL and JEFFREY/PROVIDENCE to each other,

c) CAPITAL absorbed JEFFREY, PROVIDENCE and each employee of PROVIDENCE,

d) CAPITAL built its financial services with the employees of PROVIDENCE, and

e) Each defendant dishonored its contract to compensate Vioni.

### JURISDICTION AND VENUE

2. The Court has diversity jurisdiction of this matter pursuant to Title 28, United States Code, Section 1332(a), as plaintiffs are citizens of different states from defendants and the amount in controversy exceeds $75,000, exclusive of interests and costs.

3. Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(a)(2), since a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

### PARTIES

**A. PLAINTIFFS**

4. Lisa Vioni is a citizen of the State of Florida.

5. Vioni introduced defendant CAPITAL to defendants PROVIDENCE and JEFFREY and introduced the latter to CAPITAL.

6. Hedge Connection Inc. ("**HCI**") is a corporation formed under the laws of the State of Florida on May 3, 2005. It has its headquarters and principal place of business in Florida and is wholly owned by Lisa Vioni.

- 2 -

7.    Vioni, individually, took the actions alleged in this complaint.

8.    In certain instances, Vioni sent and received e-mail using the HCI internet domain name.

9.    In certain instances, Vioni signed her e-mail using HCI as her address.

10.   HCI is named as a plaintiff in the alternative, in the event that the facts establish that HCI is also a party in interest.

**B.    DEFENDANT AMERICAN CAPITAL STRATEGIES, LTD.**

11.   CAPITAL is a publicly traded regulated investment corporation. Its stock trades on the Nasdaq market under the symbol "ACAS."

12.   CAPITAL was incorporated under the laws of the State of Delaware on February 10, 1986. It has its headquarters and principal place of business in Maryland.

13.   CAPITAL also has offices at 505 Fifth Avenue, New York, New York. In addition, CAPITAL has offices in Boston, Philadelphia, Dallas, Los Angeles, Palo Alto, San Francisco, and Chicago. In Europe, it has offices in London, Paris, Madrid and Frankfurt.

14.   At all times material to this complaint, CAPITAL was in the global asset management business. CAPITAL is an investor in management and employee buyouts, private equity buyouts and

early stage and mature private and public companies. As of September 30, 2007, CAPITAL had approximately $17 billion of assets under management.

15.  At all times material to this complaint, in its dealings with Vioni, CAPITAL acted primarily through Robert K. Grunewald, Managing Director, Financial Services Group.

### 1.    American Capital Agency Corp.

16.  CAPITAL incorporated American Capital Agency Corp. in the State of Delaware on January 7, 2008 ("**AGENCY**").

17.  AGENCY has its headquarters and principal place of business in Maryland.

18.  CAPITAL formed AGENCY to invest exclusively in single-family residential mortgage pass-through securities and Collateralized Mortgage Obligations ("**CMOs**") for which the principal and interest payments are guaranteed by a U.S. Government agency or a U.S. Government-sponsored entity.

19.  AGENCY will elect to be taxed, and intends to qualify, as a Real Estate Investment Trust ("**REIT**") for federal income tax purposes.

20.  Shares in AGENCY will be sold to the public through an initial public offering.

21.  Simultaneously with the completion of the offering, CAPITAL will purchase in a private placement a minimum of $50 million of

- 4 -

the common stock of AGENCY at the initial public offering price.

22.  AGENCY will commence business upon completion of the offering.

23.  AGENCY will have no employees.

24.  JEFFREY is a Senior Vice President of AGENCY.

### 2.   American Capital Management LLC

25.  American Capital Management LLC ("**MANAGEMENT**") is wholly owned by CAPITAL through a subsidiary of CAPITAL, American Capital, LLC, a wholly owned portfolio company.

26.  MANAGEMENT was incorporated under the laws of the State of Delaware on May 16, 2002.

27.  MANAGEMENT has its headquarters and principal place of business in Maryland.

28.  MANAGEMENT will manage AGENCY.

29.  JEFFREY and two former employees of PROVIDENCE are officers of MANAGEMENT.

30.  MANAGEMENT will have no employees.

31.  MANAGEMENT will enter into an administrative services agreement with CAPITAL, or an affiliate that has access to CAPITAL'S resources, pursuant to which MANAGEMENT will have access to CAPITAL's employees, infrastructure, business relationships, management expertise, and capital raising

capabilities.

C.  **DEFENDANTS PROVIDENCE INVESTMENT MANAGEMENT LLC, PROVIDENCE INVESTMENT PARTNERS, LLC AND JEFFREY**

    **1.    PROVIDENCE INVESTMENT MANAGEMENT LLC**

32.  PROVIDENCE MANAGEMENT was formed under the laws of the State of Delaware on November 20, 2003.

33.  PROVIDENCE MANAGEMENT had its headquarters and principal place of business, at all times material to this complaint, at 76 Westminster Street, Suite 1400, Providence, Rhode Island.

34.  PROVIDENCE MANAGEMENT was a nine-employee investment management company.

35.  PROVIDENCE MANAGEMENT managed and planned to manage Mortgage-Backed Securities (MBS) and Structured Finance and Credit Focused Hedge Funds, and a Mortgage-Backed Securities Real Estate Investment Trust.

36.  In late 2007, PROVIDENCE MANAGEMENT projected it would have $1.6 Billion in assets under management.

    **2.    PROVIDENCE INVESTMENT PARTNERS, LLC**

37.  Providence Investment Partners, LLC was formed under the laws of the State of Delaware on December 15, 2006.

38.  PROVIDENCE PARTNERS was registered to do business in Rhode Island on April 27, 2007.

39.  PROVIDENCE PARTNERS has its principal place of business at 76 Westminster Street, Suite 1400, Providence, Rhode Island.

40. PROVIDENCE PARTNERS owns and controls PROVIDENCE MANAGEMENT.

41. PROVIDENCE MANAGEMENT owns and controls PROVIDENCE PARTNERS.

42. CAPITAL entered into transactions known and unknown with PROVIDENCE MANAGEMENT, PROVIDENCE PARTNERS or both.

### 3. RUSSELL JEFFREY

43. JEFFREY was at all times material to this complaint a resident of the State of Rhode Island.

44. PROVIDENCE MANAGEMENT employed JEFFREY as Chief Executive Officer and Chief Investment Strategist.

45. JEFFREY was the majority owner and a managing member of PROVIDENCE MANAGEMENT.

46. At all times material to this complaint, in its dealings with Vioni, PROVIDENCE MANAGEMENT acted primarily through JEFFREY.

47. JEFFREY is the manager of PROVIDENCE PARTNERS.

48. At all times material to this complaint, in its dealings with Vioni, PROVIDENCE PARTNERS acted primarily through JEFFREY.

49. At all times material to this complaint, in his dealings with Vioni, JEFFREY also acted in his individual interest.

50. At the time of his employment by CAPITAL, on behalf of

himself and PROVIDENCE, JEFFREY agreed with CAPITAL:

a) That PROVIDENCE would not make certain investments,

b) That JEFFREY would devote his full-time attention and energies to his employment with CAPITAL,

c) That JEFFREY was entitled to continue to provide services to PROVIDENCE and to investment vehicles managed by PROVIDENCE, as long as his activities did not detract significantly from his work on behalf of CAPITAL, and

d) That during his employment by CAPITAL, JEFFREY would cause all management fees earned by PROVIDENCE to be assigned to CAPITAL or its designee.

51.  JEFFREY is a Senior Vice President and Managing Director of CAPITAL; a Senior Vice President of AGENCY; and Chief Investment Officer and a Vice President of MANAGEMENT.

## DETAILED STATEMENT OF FACTS

**A.  CAPITAL AND JEFFREY/PROVIDENCE CONTRACT FOR VIONI'S SERVICES**

52.  On November 14, 2006, Robert Grunewald, Managing Director of CAPITAL, met with Vioni at CAPITAL's offices in New York City to discuss the expansion of the financial services CAPITAL offered.

53.  At the November 14 meeting, Grunewald expressed a desire to grow CAPITAL's financial services business by means of investing in hedge funds.

54.  At the November 14 meeting, Grunewald said that CAPITAL would potentially sell the hedge funds to the public.

55.  Grunewald said to Vioni in his telephone conversation to

- 8 -

set up the November 14 meeting that CAPITAL could not internally
raise the monies needed for investment in the hedge funds.

56.  During November 2006, at the request of Jeffrey and
PROVIDENCE, Vioni introduced JEFFREY and PROVIDENCE to investors
other than CAPITAL to enable PROVIDENCE to expand its business
and to attract additional resources.

57.  Between October 2006 and September 2007, CAPITAL contracted
with Vioni in writing to compensate her for her efforts in
introducing the company to one or more persons or entities that
would further CAPITAL's goal.

58.  Between October 2006 and September 2007, JEFFREY and
PROVIDENCE contracted with Vioni in writing to compensate her
for her efforts in introducing the company to one or more
persons or entities that would further JEFFREY's and
PROVIDENCE's goal.

**B.    VIONI INTRODUCES CAPITAL AND JEFFREY/PROVIDENCE**

59.  In April 2007, acting as a Finder for CAPITAL, at the
request of Robert Grunewald, Vioni introduced Grunewald and
CAPITAL to JEFFREY and PROVIDENCE.

60.  In April 2007, acting as a Finder for JEFFREY and
PROVIDENCE, Vioni introduced JEFFREY to Grunewald and CAPITAL.

61.  In e-mails dated April 4, 2007, JEFFREY confirmed that he
wanted Vioni to introduce him and PROVIDENCE to CAPITAL.

- 9 -

62. In e-mails dated April 4 and 9, 2007, Grunewald confirmed that he wanted Vioni to introduce him to a specialist in managing investments in mortgage-backed securities.

63. Vioni, Grunewald and JEFFREY spoke by telephone on April 13, 2007 and arranged to meet on Wednesday April 18, 2007.

64. On April 18, 2007, Vioni introduced JEFFREY and Grunewald to each other at a meeting in New York City.

65. Outside the April 18, 2007 meeting, in the presence of Vioni, Grunewald told JEFFREY that CAPITAL wanted to buy PROVIDENCE, subject to a due diligence examination.

66. Outside the April 18, 2007 meeting, in the presence of Vioni and JEFFREY, Grunewald acknowledged that Vioni would be paid and raised the issue how Vioni would be paid on an unending access to capital.

67. In e-mails dated April 19, 2007, Vioni and JEFFREY confirmed the latter's statement that Vioni would be paid for her services for introducing JEFFREY, PROVIDENCE and CAPITAL to each other.

68. In e-mails dated April 19, 2007, JEFFREY and Vioni confirmed that Vioni would be paid for her services for monies invested in funds managed by JEFFREY calculated on the future growth of the funds.

69. In an e-mail dated April 19, 2007, in response to

Grunewald's April 18 e-mail, Vioni confirmed to Grunewald CAPITAL's interest in having the PROVIDENCE employees joining CAPITAL.

70.  In an e-mail dated April 20, 2007, Grunewald confirmed to Vioni that Vioni would be paid by CAPITAL for her services, with details of payment dependent on the final structure of the transactions.

71.  On April 20, 2007, JEFFREY and Vioni met in New York City and discussed the combination of JEFFREY and PROVIDENCE with CAPITAL.

72.  On April 22, 2007, Vioni advised Grunewald by e-mail of her meeting with JEFFREY on April 20.

73.  On April 22, 2007, Vioni advised Grunewald by e-mail that JEFFREY would advise a potential investor in PROVIDENCE to make its investment of $100 million in a new hedge fund to be managed by CAPITAL.

**C.    CAPITAL MAKES AN OFFER TO JEFFREY AND PROVIDENCE**

74.  Grunewald asked Vioni, in an e-mail dated April 22, 2007, to determine what compensation package JEFFREY required.

75.  Grunewald confirmed, in an e-mail dated April 23, 2007, that Vioni would be paid in relation to PROVIDENCE, with details of the payment dependent on the final structure of the transactions.

- 11 -

76. On April 24, 2007, as the result of the introduction of JEFFREY to Grunewald by Vioni, JEFFREY had dinner in Boston with the Chief Financial Officer and others from CAPITAL.

77. JEFFREY confirmed, by e-mail dated April 25, 2007, that the Chief Financial Officer of CAPITAL was in the offices of PROVIDENCE that day.

78. On April 27, 2007, JEFFREY caused PROVIDENCE PARTNERS to be registered to do business in Rhode Island.

79. As a result of the introductions made by Vioni, defendants planned that CAPITAL and its affiliates would enter into, and they did enter into, transactions, among other transactions known and unknown, with PROVIDENCE, JEFFREY, the employees of PROVIDENCE, investors in PROVIDENCE, trusts and funds managed by PROVIDENCE, and with potential investors in trusts and funds managed by PROVIDENCE. (collectively "ACSL Transactions").

80. On May 7, 2007, CAPITAL's Investment Committee looked favorably on the proposal to enter into the ACSL Transactions.

81. On May 8, 2007, Vioni and Grunewald discussed CAPITAL creating a hedge fund that would invest only in mortgage-backed securities.

82. In e-mails dated May 14, 2007, JEFFREY and Vioni confirmed that she would be paid in relation to the ACSL Transactions.

83. In an e-mail to JEFFREY dated May 14, 2007, Vioni repeated

that the details of the payment for her services would be determined when the structure of the ACSL Transactions were known.

84.    JEFFREY and Grunewald discussed mortgage-backed securities at dinner in New York City on May 21, 2007.

85.    JEFFREY was informed for the first time on May 31, 2007 that he had a deal with CAPITAL and reported that to Vioni by e-mail.

86.    On June 14, 2007, JEFFREY and Vioni exchanged proposals related to the structure of the ACSL Transactions.

87.    On June 18, 2007, JEFFREY stated that he and Grunewald agreed that the ACSL transactions were a direct result of the introduction by Vioni.

88.    On June 18, 2007, JEFFREY stated that Vioni should be paid according to industry standards.

89.    On June 18, 2007, JEFFREY stated that Grunewald often said that Vioni added a lot of value and should be paid a substantial amount for the introductions related to the ACSL Transactions.

90.    Vioni told Grunewald by e-mail dated June 22, 2007 that they should talk when the negotiations with JEFFREY were final.

91.    Grunewald told Vioni on June 25, 2007, that CAPITAL was examining how to calculate the Finder Fees that will be owed to

Vioni for the introduction of CAPITAL to JEFFREY and PROVIDENCE.

92.  On July 17, 2007, in an e-mail, Grunewald stated a) that
Vioni introduced the employees of PROVIDENCE; b) that CAPITAL
paid fees for recruiting employees; c)that Vioni introduced
JEFFREY to CAPITAL; d) that the introduction of JEFFREY and
PROVIDENCE was expected to lead to profit based on management
fees received by CAPITAL ; e) that the introduction made it
likely that CAPITAL could now create a new mortgage-backed
securities hedge fund; f) that Vioni should be paid for making
the introduction; and g) that CAPITAL would defer to JEFFREY
regarding fees to be paid to Vioni related to money raised and
to be raised.

93.  Grunewald told Vioni at a meeting at CAPITAL's Maryland
office on July 25, 2007 that Vioni would be paid for her
services.

**D.   CAPITAL ABSORBS JEFFREY/PROVIDENCE AND HIRES EACH EMPLOYEE
      OF PROVIDENCE**

94.  By August 15, 2007, CAPITAL had made an offer to hire each
employee of PROVIDENCE.

95.  On August 15, 2007, JEFFREY informed Vioni that he and
Grunewald had agreed that she would be paid a fee for the
introduction of JEFFREY and PROVIDENCE to CAPITAL.

96.  By August 15, 2007, CAPITAL had agreed to invest $100
million in the new Residential Mortgage-Backed Securities hedge

- 14 -

fund to be managed by JEFFREY at CAPITAL, starting with $20 million.

97.  After JEFFREY received his copy of the ACSL Transactions documents, in August 2007, he told Vioni that CAPITAL agreed to pay fees to the funds on the money it invested in funds managed by JEFFREY.

98.  On August 15, 2007, Grunewald told Vioni that CAPITAL would pay 2% and 20% fees on the money it invested in the hedge fund.

99.  JEFFREY also informed Vioni on August 15, 2007 that he and Grunewald had agreed that she would be paid a fee on the money invested into the new hedge fund to be created by CAPITAL.

100. CAPITAL agreed to name Vioni or HCI in its press release as being responsible for the introduction of CAPITAL to PROVIDENCE and JEFFREY.

101. On August 16, 2007, Vioni wrote Grunewald asking him to provide her with a copy of the ACSL Transactions documents.

102. As a result of the introductions made by Vioni, JEFFREY and PROVIDENCE transferred to CAPITAL, and to affiliates and funds controlled by CAPITAL, monies previously invested in hedge funds managed by PROVIDENCE.

103. As a result of the introductions made by Vioni, JEFFREY and PROVIDENCE caused potential investors in PROVIDENCE managed funds to transfer monies to CAPITAL, and to affiliates and funds

- 15 -

managed and controlled by CAPITAL.

104. As a result of the introductions made by Vioni, in September 2007, CAPITAL and its affiliates hired each employee of PROVIDENCE, including JEFFREY (collectively "**Providence Investment Team**").

105. As a result of the introductions made by Vioni, PROVIDENCE facilitated the hiring of the Providence Investment Team by CAPITAL and its affiliates.

106. JEFFREY and the other employees of PROVIDENCE were employed by CAPITAL or an affiliate of CAPITAL.

107. CAPITAL hired JEFFREY as head of its eight-member Residential Mortgage-Backed Securities investment team and as Chief Investment Officer.

108. CAPITAL hired the employees of PROVIDENCE in order to pursue various investment strategies including investments in Residential Mortgage-Backed Securities.

109. The successful implementation of the investment and financing strategies of CAPITAL and AGENCY depended to a significant extent upon JEFFREY.

110. CAPITAL expected JEFFREY and the Providence Investment Team to be a differentiating competitive advantage relative to its competitors.

111. CAPITAL expected JEFFREY and the Providence Investment Team to provide services to AGENCY, MANAGEMENT, CAPITAL and other Residential Mortgage-Backed Securities investment vehicles that have been or may be sponsored by CAPITAL.

112. In September 2007, through terms of the employment agreement between JEFFREY and CAPITAL and between CAPITAL and the other PROVIDENCE employees it hired, CAPITAL:

   a)   Acquired the management fee income of PROVIDENCE,
   b)   Restricted the types of investments that could be made by PROVIDENCE,
   c)   Acquired as employees JEFFREY and all the other experienced employees of PROVIDENCE,
   d)   Acquired the fulltime attention and energies of JEFFREY, and
   e)   Acquired the track record, of PROVIDENCE, JEFFREY and of the Providence Investment Team, for successful investment management including management of investments in mortgage-backed securities.

113. In September 2007, by making the above agreements and acquisitions, CAPITAL acquired the human assets and management income of PROVIDENCE.

114. In September 2007, CAPITAL's agreement with JEFFREY prevented PROVIDENCE from investing in certain financial products.

115. In September 2007, CAPITAL materially limited the ability of JEFFREY to work with PROVIDENCE.

116. As a result of the introductions made by Vioni, in

September 2007 and afterwards, PROVIDENCE facilitated the
transfer of hedge funds and trusts and monies from PROVIDENCE to
CAPITAL and its affiliates.

117. As a result of the introductions made by Vioni, in
September 2007 and afterwards, JEFFREY and PROVIDENCE persuaded
investors and potential investors to invest in hedge funds,
trusts and other financial instruments, known and unknown,
managed or under the direct and indirect control of PROVIDENCE,
and of CAPITAL and its affiliates.

118. As a result of the ACSL Transactions, PROVIDENCE ceased to
operate in all material respects as it had operated prior to
such transactions.

119. The ACSL Transactions combined PROVIDENCE, its customers,
prospective customers, and their investments, and the Providence
Investment Team with CAPITAL and its affiliates, and the related
funds and trusts to be managed by the Providence Investment
Team.

E.   **CAPITAL BUILDS ITS FINANCIAL SERVICES WITH PROVIDENCE AND
     THE PROVIDENCE INVESTMENT TEAM**

120. In October 2007, CAPITAL and its affiliates invested
approximately $29 Million in an investment vehicle managed by
the Providence Investment Team that employs a credit-sensitive
Residential Mortgage-Backed Securities ("**RMBS**") or other
investment strategy.

121. As a result of the introductions made by Vioni, in January 2008, CAPITAL incorporated American Capital Agency Corp.

122. CAPITAL formed AGENCY as a Real Estate Investment Trust to be managed under the supervision of JEFFREY.

123. CAPITAL formed AGENCY as a Real Estate Investment Trust with the express purpose of investing in Residential Mortgage-Backed Securities.

124. CAPITAL invested or will invest a minimum of $50 million in AGENCY upon its initial public offering as part of a sale intended to raise an additional $350 million.

125. CAPITAL will have the Providence Investment Team manage the $400 million invested in AGENCY.

126. CAPITAL and the Providence Investment Team have raised and intend to raise additional millions of dollars to be managed by the Providence Investment Team.

**F.    CAPITAL AND JEFFREY/PROVIDENCE EACH DISHONOR ITS AGREEMENT TO COMPENSATE VIONI**

127. On August 16, 2007, Vioni wrote Grunewald asking him to provide her with a copy of the documents that detailed the structure of the ACSL Transactions.

128. By letter dated November 30, 2007, Vioni requested that PROVIDENCE, JEFFREY and CAPITAL provide her with copies of the documents that detailed the structure of the ACSL Transactions.

- 19 -

129. CAPITAL, PROVIDENCE and JEFFREY provided no documents to Vioni related to the completed ACSL Transactions.

130. CAPITAL, PROVIDENCE and JEFFREY paid nothing to HCI or to Vioni for the introductions Vioni made that resulted in the ACSL Transactions.

131. CAPITAL, PROVIDENCE and JEFFREY paid nothing to HCI or to Vioni for the other services Vioni provided that resulted in the ACSL Transactions.

132. Regulations may have required Vioni to register as a representative with a broker-dealer at the time payments were due to her from defendants, depending on the nature of the transaction.

133. Vioni did not register when it was clear that defendants would default in making payment for her services.

134. Vioni can and will become registered as required.

## FIRST CAUSE OF ACTION
### BREACH OF CONTRACT BY CAPITAL

135. Plaintiffs re-allege paragraphs 52 through 134 as though fully set forth here.

136. Between October 2006 and September 2007, defendant CAPITAL entered into a contract with Vioni and HCI to introduce to CAPITAL persons and entities to help CAPITAL grow its business.

137. Pursuant to the terms of the Contract, among other services

plaintiffs, directly and indirectly:

a) Introduced CAPITAL to PROVIDENCE and JEFFREY and introduced the latter to CAPITAL,

b) Introduced CAPITAL to each employee of PROVIDENCE and introduced the latter to CAPITAL,

c) Introduced CAPITAL to investors in funds managed by PROVIDENCE and introduced the latter to CAPITAL, and

d) Introduced CAPITAL to investors who planned to invest through PROVIDENCE and introduced the latter to CAPITAL.

138. As a result of such introductions, plaintiffs enabled and were directly and indirectly responsible for the following, among other transactions:

a) CAPITAL acquired the services, experience and expertise of the Providence Investment Team as well as the track record of the Providence Investment Team,

b) PROVIDENCE transferred to CAPITAL investments previously managed by PROVIDENCE,

c) PROVIDENCE caused prospective investors to transfer to CAPITAL investments previously planned to be management by PROVIDENCE,

d) CAPITAL sold the services of the Providence Investment Team based on its track record in managing Mortgage-Backed Securities hedge funds,

e) CAPITAL and its affiliates invested $29 million in a fund managed by JEFFREY for CAPITAL and its affiliates,

f) CAPITAL formed AGENCY and registered its prospectus to make and made an initial public offering of its stock for $400 million to be invested in a Real Estate Investment Trust,

g) CAPITAL sold the Real Estate Investment Trust to the public by highlighting its investment of a minimum of $50 million in AGENCY as part of the $400 million to be raised,

h) CAPITAL sold and will sell one or more Real Estate Investment Trusts and other funds to the public by

- 21 -

promoting that the Providence Investment Team would
manage the REIT or fund for CAPITAL,

i)   AGENCY attracted investors including CAPITAL to invest
     in the $400 million Initial Public Offering;

j)   CAPITAL collected and will collect management fees and
     performance fees paid for managing monies invested in
     one or more Real Estate Investment Trusts and in other
     funds, and

k)   CAPITAL will collect management fees paid for managing
     monies, if any, still invested in REITs and funds
     managed by PROVIDENCE after the ACSL Transactions.

139. Plaintiffs were the sole procuring cause of the ACSL
Transactions.

140. Plaintiffs fully performed under the terms of the contract.

141. Pursuant to the contract, CAPITAL agreed to pay plaintiffs
for their services.

142. Pursuant to the contract, CAPITAL agreed to pay plaintiffs
amounts dependent on the final structure of the ACSL
Transactions.

143. CAPITAL has not paid plaintiffs for their services.

144. CAPITAL has concealed from plaintiffs the information
plaintiffs need to determine the amount of the payment owed to
them.

145. CAPITAL owes plaintiffs the following fees, among others:

a)   A Finders' Fee for the introduction of CAPITAL to
     JEFFREY and PROVIDENCE,

b)   A fee for the acquisition and hiring of the entire
     Providence Investment Team, and for the investments
     transferred from PROVIDENCE funds and from prospective

investors in PROVIDENCE managed funds (**"Lift-Out Fee"**),

c) Marketing Fees for the monies invested as the direct and indirect result of the transactions between PROVIDENCE, JEFFREY, investors and prospective investors in Real Estate Investment Trusts and funds managed and to be managed, in part, by JEFFREY for CAPITAL, including the full value of the monies in the AGENCY REIT (**"Jeffrey Funds"**),

d) A percentage of the management fees received by CAPITAL related to the Jeffrey Funds, for each year until such funds are fully liquidated or redeemed, and

e) A percentage of the performance fees received by CAPITAL related to the Jeffrey Funds, for each year until such funds are fully liquidated or redeemed.

146. CAPITAL owes plaintiffs fees calculated on the basis of the value of each of the benefits received by CAPITAL as a direct and indirect result of the introductions by plaintiffs.

147. As a result of the breach of contract by CAPITAL, CAPITAL has damaged plaintiffs in an amount to be determined at trial, believed to be in excess of $15,000,000.

## SECOND CAUSE OF ACTION
### QUANTUM MERUIT – CAPITAL

148. Plaintiffs re-allege paragraphs 52 through 134 and 136 through 146 as though fully set forth here.

149. Plaintiffs performed work, labor and services that Vioni provided to CAPITAL, at its request.

150. CAPITAL has not paid plaintiffs for services rendered by Vioni between October 1, 2006 and September 30, 2007.

151. CAPITAL has concealed from plaintiffs the information plaintiffs need to determine the amount of the payment owed to them.

152. The reasonable value of the services for which CAPITAL has not made payment is to be determined at trial but is believed to be in excess of $15,000,000.

153. As a result of the breach by CAPITAL, CAPITAL has damaged plaintiffs in an amount to be determined at trial, believed to be in excess of $15,000,000.

### THIRD CAUSE OF ACTION
### BREACH OF LIFT-OUT CONTRACT BY CAPITAL

154. Plaintiffs re-allege paragraphs 52 through 134 and 136 through 146 as though fully set forth here.

155. CAPITAL retained plaintiffs to enable CAPITAL to hire JEFFREY and each employee of PROVIDENCE.

156. CAPITAL retained plaintiffs to enable CAPITAL to acquire investments made in funds managed by PROVIDENCE.

157. CAPITAL retained plaintiffs to enable CAPITAL to acquire investments previously being considered for management by PROVIDENCE.

158. Plaintiffs performed each service that they were retained to perform for CAPITAL ("**Lift-out Services**").

159. As a result of the Lift-out Services performed by

plaintiffs, CAPITAL hired JEFFREY and each other employee of PROVIDENCE.

160. As a result of the Lift-out Services performed by plaintiffs, investments managed by PROVIDENCE were transferred to CAPITAL.

161. As a result of the Lift-out Services performed by plaintiffs, investments previously being considered for management by PROVIDENCE were made in funds managed by CAPITAL.

162. CAPITAL agreed to pay plaintiffs industry standard fees for their Lift-out Services ("**Lift-out Fees**").

163. The industry standard fees for Lift-out Services are 33.33% of the value of the related service, as described below.

164. For plaintiffs' services, for the first year of employment, CAPITAL owes plaintiffs 33.33% of the annual compensation paid to JEFFREY and the former employees of PROVIDENCE.

165. For plaintiffs' services, with respect to investments transferred from PROVIDENCE to CAPITAL and to funds owned and controlled by CAPITAL, for the first year such fees are under management by Capital and its funds, CAPITAL owes plaintiffs 33.33% of the management fees charged by CAPITAL and its funds on the amount of such investment transfers; and 33.33% of the performance fees charged by CAPITAL and its funds on profits made on such investment transfers.

166. For plaintiffs' services, with respect to investments that were previously being considered for management by PROVIDENCE or JEFFREY but were made instead in CAPITAL and its funds, for the first year such fees are under management by Capital and its funds, CAPITAL owes plaintiffs 33.33% of the management fees charged by CAPITAL and its funds on the amount of such investments; and 33.33% of the performance fees charged by CAPITAL and its funds on profits made on such investments.

167. CAPITAL has not paid plaintiffs for their Lift-Out Services.

168. CAPITAL has concealed from plaintiffs the information plaintiffs need to determine the amount of the payment owed to them.

169. As a result of the breach of contract by CAPITAL, CAPITAL has damaged plaintiffs in an amount to be determined at trial, believed to be in excess of $8,000,000.

### FOURTH CAUSE OF ACTION
### QUANTUM MERUIT – CAPITAL – LIFT-OUT CONTRACT

170. Plaintiffs re-allege paragraphs 52 through 134, 136 through 146, and 155 through 168 as though fully set forth here.

171. Plaintiffs performed work, labor and Lift-out Services that were provided to CAPITAL, at its request.

172. CAPITAL has not paid plaintiffs for Lift-out Services.

rendered between October 2006 and September 30, 2007.

173. CAPITAL has concealed from plaintiffs the information plaintiffs need to determine the amount of the payment owed to them.

174. The reasonable value of the services for which CAPITAL has not made payment is to be determined at trial but is believed to be in excess of $8,000,000.

175. As a result of the breach by CAPITAL, CAPITAL has damaged plaintiffs in an amount to be determined at trial, believed to be in excess of $8,000,000.

### FIFTH CAUSE OF ACTION
### BREACH OF CONTRACT - JEFFREY & PROVIDENCE

176. Plaintiffs re-allege paragraphs 52 through 134 as though fully set forth here.

177. Between October 2006 and September 2007, defendants JEFFREY and PROVIDENCE entered into a contract to have Vioni and HCI introduce them to persons and entities to help PROVIDENCE grow its business.

178. Pursuant to the terms of the Contract, among other services plaintiffs, directly and indirectly:

    a)    Introduced CAPITAL to PROVIDENCE and JEFFREY and introduced the latter to CAPITAL,

    b)    Introduced CAPITAL to each employee of PROVIDENCE and introduced the latter to CAPITAL,

    c)    Introduced CAPITAL to investors in Real Estate
          Investment Trusts and funds managed by PROVIDENCE and
          introduced the latter to CAPITAL, and

    d)    Introduced CAPITAL to investors who planned to invest
          through PROVIDENCE and introduced the latter to
          CAPITAL.

179. As a result of such introductions, plaintiffs enabled and

were directly and indirectly responsible for the following,

among other transactions:

    a)    CAPITAL acquired the services, experience and
          expertise of the Providence Investment Team as well as
          the track record of the Providence Investment Team,

    b)    PROVIDENCE transferred to CAPITAL investments
          previously managed by PROVIDENCE,

    c)    PROVIDENCE caused prospective investors to transfer to
          CAPITAL investments previously planned to be
          management by PROVIDENCE,

    d)    CAPITAL sold the services of the Providence Investment
          Team based on its track record in managing Mortgage-
          Backed Securities hedge funds,

    e)    CAPITAL and its affiliates invested $29 million in a
          fund managed by JEFFREY for CAPITAL and its
          affiliates,

    f)    CAPITAL formed AGENCY and registered its prospectus to
          make and made an initial public offering of its stock
          for $400 million to be invested in a Real Estate
          Investment Trust,

    g)    CAPITAL sold the Real Estate Investment Trust to the
          public by highlighting its investment of a minimum of
          $50 million in AGENCY as part of the $400 million to
          be raised,

    h)    CAPITAL sold and will sell one or more Real Estate
          Investment Trusts and other funds to the public by
          promoting that the Providence Investment Team would
          manage the fund for CAPITAL,

    i)    AGENCY attracted investors including CAPITAL to invest
          in the $400 million Initial Public Offering.

    j)    CAPITAL collected and will collect management fees and
          performance fees paid for managing monies invested in

one or more Real Estate Investment Trusts and in other funds. and

k)   CAPITAL will collect management fees paid for managing monies, if any, still invested in funds managed by PROVIDENCE after the ACSL Transactions.

180. Plaintiffs were the sole procuring cause of the ACSL Transactions.

181. Plaintiffs fully performed under the terms of the contract.

182. Pursuant to the contract, JEFFREY and PROVIDENCE agreed to pay plaintiffs for their services.

183. Pursuant to the contract, JEFFREY and PROVIDENCE agreed to pay plaintiffs amounts dependent on the final structure of the ACSL Transactions.

184. JEFFREY and PROVIDENCE have concealed from plaintiffs the information plaintiffs need to determine the amount of the payment owed to them.

185. JEFFREY and PROVIDENCE have not paid plaintiffs for their services.

186. JEFFREY and PROVIDENCE owe plaintiffs the following fees, among others:

a)   A Finders' Fee for the introduction of CAPITAL to JEFFREY and PROVIDENCE,

b)   Marketing Fees for the monies invested as the direct and indirect result of the transactions between PROVIDENCE, JEFFREY, investors and prospective investors in the Jeffrey Funds,

c)   A percentage of the management fees received by CAPITAL related to the Jeffrey Funds, for each year until such funds are liquidated or redeemed, and

d)   A percentage of the performance fees received by CAPITAL related to the Jeffrey Funds, for each year until such funds are liquidated or redeemed.

187. JEFFREY and PROVIDENCE owe plaintiffs fees calculated on the basis of the value of each of the benefits received by JEFFREY and PROVIDENCE as a direct and indirect result of the introductions by plaintiffs.

188. As a result of the breach of contract by JEFFREY and PROVIDENCE, JEFFREY and PROVIDENCE have damaged plaintiffs in an amount to be determined at trial, believed to be in excess of $15,000,000.

### SIXTH CAUSE OF ACTION
### QUANTUM MERUIT - JEFFREY & PROVIDENCE

189. Plaintiffs re-allege paragraphs 52 through 134 and 177 through 187 as though fully set forth here.

190. Plaintiffs performed work, labor and services that Vioni provided to JEFFREY and PROVIDENCE, at their request.

191. JEFFREY and PROVIDENCE have not paid plaintiffs for services rendered by Vioni between October 1, 2006 and September 30, 2007.

192. JEFFREY and PROVIDENCE have concealed from plaintiffs the information plaintiffs need to determine the amount of the payment owed to them.

193. The reasonable value of the services for which JEFFREY and PROVIDENCE has not made payment is to be determined at trial but is believed to be in excess of $15,000,000.

194. As a result of the breach by JEFFREY and PROVIDENCE, JEFFREY and PROVIDENCE have damaged plaintiffs in an amount to be determined at trial, believed to be in excess of $15,000,000.

**JURY DEMAND**

195. Plaintiffs demand trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully request the Court enter judgment in their favor and against defendants for the following relief:

a.    On the first and second causes of action, awarding compensatory damages against CAPITAL in an amount to be determined at trial, believed to be in excess of $15,000,000,

b.    On the third and fourth causes of action, awarding compensatory damages against CAPITAL in an amount to be determined at trial, believed to be in excess of $8,000,000,

c.    On the fifth and sixth causes of action, awarding compensatory damages against JEFFREY and PROVIDENCE in an amount to be determined at trial believed to be in excess of $15,000,000,

d.    Awarding pre- and post-judgment interest pursuant to 28 U.S.C. § 1961(a) and N.Y. C.P.L.R. §§ 5001, 5003,

- 31 -

e.    Awarding costs and attorneys' fees in an amount to be determined at trial, and

d.    Awarding such other and further relief, legal or equitable, as the Court may deem just and proper.

Dated:  March 20, 2007
        New York, New York

Respectfully submitted,
CAREY & ASSOCIATES LLC

By: _____
        Michael Q. Carey
521 Fifth Avenue, Suite 3300
New York, NY 10175-3399
Tel.: 212-758-0076
mqc@CareyLitigation.com

Attorneys for Plaintiffs

- 32 -

UNITED STATES DISTRICT COURT

FOR THE

SOUTHERN DISTRICT OF NEW YORK

LISA VIONI and
HEDGE CONNECTION INC.,                        :
                                              :
                                              :
                    Plaintiffs,               :   Civil Action No.
                                              :   08-cv- _____ (___)
          v.                                  :
                                              :
AMERICAN CAPITAL STRATEGIES, LTD.,            :
PROVIDENCE INVESTMENT MANAGEMENT, LLC,        :   JURY TRIAL DEMANDED
PROVIDENCE INVESTMENT PARTNERS, LLC,          :
And RUSSELL JEFFREY,                          :
                                              :
                    Defendants.               :


**COMPLAINT**


CAREY AND ASSOCIATES LLC
Michael Q. Carey
521 Fifth Avenue, Suite 3300
New York, New York 10175-3399
212-758-0076
mqc@careylitigation.com

Attorneys for Plaintiffs

# EXHIBIT B

Hedge Connection

Join | Login

June 23, 2008

Home
Join
Success Stories
In the News
Lisa's Marketing Tips
Events
  Hedge Connection
  Industry Conferences
Legal
  Terms of Use
  Privacy
  Disclosure Statement
Service Provider Directory
Advertise
About Us
Contact Us

## About Us

Hedge Connection is the first comprehensive, web-based, marketing tool that facilitates relationship building and allows direct interaction and exchange of information between hedge funds and opt-in, qualified investors. It is a vibrant marketing tool for all hedge funds and should be one spoke of any manager's annual marketing program.

Built on a foundation of industry experience and guided by the core principles of **integrity, partnership and value**, Hedge Connection represents the evolution of the traditional database-driven, "capital intro" model. Unlike a static database, Hedge Connection members can actively reach out to each other through our controlled club environment. We also offer several live events throughout the year to members to encourage face to face meetings and networking opportunities.

Hedge Connection addresses the clear need among managers to efficiently build their investor network. Hedge Connection provides managers and investors a secure platform to meet and exchange ideas and information. Hedge funds can manage their marketing process and gain direct access to relevant, qualified active hedge fund allocators when becoming a Hedge Connection Club Hedge Member.

Investor members join for FREE and gain direct access to a wealth of information on Hedge Connection hedge fund members. Resources include manager bios, detailed performance metrics, video presentations, and current marketing materials. Investors save time and avoid unwanted cold calls by communicating their investment priorities directly through Hedge Connection. Investor members also receive priority registration to all member events throughout the year including breakfast seminars and bi-annual networking events.

Service providers to the hedge fund industry may participate via the service provider directory. There are also several advertising and sponsorship opportunities available. For more information, please contact us at advertise@hedgeconnection.com.

We are committed to developing strong relationships with our hedge fund and investor membership. We have found that hedge funds have an 85% renewal rate and investors regularly update their investor profiles. References and testimonials are available upon request.

## Management

### Lisa Vioni

**Founder, CEO & President**

Ms. Vioni is an 18 year Wall Street veteran with experience raising significant capital for emerging and established funds. Her perspective and experience provided the inspiration to found the company in 2004 and officially launch Hedge Connection in 2005.

Lisa began her career in MBS sales in 1990 at Prudential Securities and later became Senior Vice President in MBS Institutional Sales at Lehman Brothers Securities where she covered money managers, banks and hedge funds.

Ms Vioni left the sell side in 1998 to market hedge funds. She joined Singleterry & Company (S&C), a small start up MBS hedge fund and later joined Ellington Management Group (EMG), a $billion + MBS hedge fund as Director of Marketing. Ms. Vioni was responsible for raising significant assets for various Ellington products. At S&C and EMG Ms. Vioni oversaw all aspects of client relationships including raising money, organizing small company conferences, developing marketing materials and client servicing.

In June of 2003, Ms. Vioni launched Investment Management Resources (IMR), a company that hosts boutique conferences putting hedge funds and investors together in private investor-intro events. IMR currently hosts 4-6 investor-intro events each year.

Lisa is a recognized expert on the subject of hedge fund marketing. She is frequently called upon to speak at industry events and offer advice to Hedge Connection members. Each month, her expertise is shared in the Lisa's Marketing Tips feature.

---

© 2008 Hedge Connection, Inc. Patent Pending

# EXHIBIT C

**From:** Russ Jeffrey
**Sent:** Thursday, April 19, 2007 9:28 AM
**To:** Lisa Vioni
**Subject:** RE: Thoughts

Lisa,
I may be back in the city as soon as tomorrow ( Friday).
I have a couple of proposals in front of me that I have to weigh and consider. Basically, I now have a couple of investors who I am pretty confident would seed the new fund ( Providence Endeavor Fund). I may have to meet them again tomorrow.
The AC deal could be great but the details will be important- frankly, the AC option has a lot of appeal, the one negative is that I would obviously not be independent anymore.
If I do go to NYC tomorrow, let's meet again if your schedule permits to iron out more specifics.

Russ

**From:** Lisa Vioni [mailto:lvioni@hedgeconnection.com]
**Sent:** Thursday, April 19, 2007 8:58 AM
**To:** Russ Jeffrey
**Subject:** Thoughts

Russell,

I am meeting with my lawyer today to start talking about drafting various engagement letters that I need to get done.  I would like to get a little more specific as soon as we can with how the deal between you and me will work. I agree that there should be a significant upfront payment for the introduction to AC and then that I should be tied to the growth of the business going forward. There will be a lot of capital coming into your organization and the company.  In our original discussion I would have received some ownership in the holding company which would ensure that I participated in the upside of the business.  This deal will mean that the holding company, which will be part of AC, will be much larger than originally expected. The opportunity is obviously much more profound now.  When we know how the deal will work for your group with AC I think we will be able to formulate something that is fair for me and gives me some sort of annuity on the growth of the company. I would also like to be the person that is used for raising money on future deals etc.

I will let you know if I hear anything from Bob. I do have a call into him.

Best,
Lisa

# EXHIBIT D

**From:**    Grunewald, Bob
**Sent:**    Thursday, April 19, 2007 8:09 PM
**To:**    Lisa Vioni
**Subject:** RE: Structure question

Lisa,

I think the only realistic way to work out a fee arrangement would be as a straight advisory fee or a commitment on our part to use you for a bigger opportunity than would have otherwise existed.

**From:** Lisa Vioni [mailto:lvioni@hedgeconnection.com]
**Sent:** Thursday, April 19, 2007 8:40 AM
**To:** Grunewald, Bob
**Subject:** Structure question

Bob,

In formulating my payment from Russell for this acquisition I need to understand how his group will be folded into AC. For example, if the other group I introduced him to ended up doing the deal we had proposed, I would have gotten an upfront fee and then ownership in the entire holding company. The ownership portion was to ensure that I would get paid some type of dividend each year as the company grew and then participate in the exit sale.

Is there any type of ownership that I could tie myself to in this structure so that I can participate in the growth of the business? Could I act as a consultant and get paid an ongoing fee on money raised for Russell's business for example? Any guidance you can give would be very appreciated.

Walter and I will be sending over a preliminary engagement letter for the hedge fund deal to you shortly. I think that we can definitely capture some part of the state money Russ mentioned yesterday for the hedge fund.

Lisa

# EXHIBIT E

---

| | |
|---|---|
| **From:** | Grunewald, Bob |
| **Sent:** | Monday, April 23, 2007 11:07 AM |
| **To:** | Lisa Vioni |
| **Cc:** | Wunz, Christopher |
| **Subject:** | RE: Engagement letter draft |

Tks.  We will need to tweak this, but lets figure out where we are on Providence first.

---

**From:** Lisa Vioni [mailto:lvioni@hedgeconnection.com]
**Sent:** Monday, April 23, 2007 10:42 AM
**To:** Grunewald, Bob
**Cc:** Walter Kirkland
**Subject:** Engagement letter draft

Bob,

As per your request, attached is an outline of an engagement letter between Walter, myself and ACS. Please let us know how you would like to proceed.

We look forward to hearing from you soon.

Best Regards,

Lisa Vioni
President
Hedge Connection Inc.
603 Longboat Club Road  #504N
Longboat Key, Florida 34228
Phone:  941 383 9768
Cell: 917 756 1328
lvioni@hedgeconnection.com
http://www.hedgeconnection.com

# HEDGE CONNECTION

**Memorandum**

| | |
|---|---|
| **Date:** | April 23, 2007 |
| **To:** | Robert K Grunewald |
| **Company:** | American Capital |
| **From:** | Lisa Vioni, Walter Kirkland |
| **Re:** | Outline for engagement letter |

Dear Bob,

This letter is an outline of how Kirkland Capital Resources, Inc. (KCR) and Lisa Vioni (LV) will work together to raise capital for American Capital's (ACS) new hedge fund. Please review the terms we have presented and let us know your thoughts. We would like to get a formal contract in place so that we can begin working closely with Chris Wunz and Chris Small to begin developing marketing materials.

**Duties:**

- KCR and LV will act as the marketing consultant to organize, coordinate and execute fund raising activities for ACS' new hedge fund.
- KCR and LV will identify potential investors for the fund/s and will work together with ACS to gain commitments for the Fund/s.
- KCR and LV will use its best efforts to introduce potential investors to ACS including funds of funds, family offices, high net worth individuals, endowments, foundations, insurance companies, banks and other accredited investors.
- KCR and LV will coordinate marketing activities with the principals of ACS and make introductory calls to prospects.
- KCR and LV will arrange meetings for ACS principals to meet with potential investors for the fund/s.
- KCR and LV will coordinate follow-up as necessary.
- KCR and LV will report to ACS on a weekly basis or monthly basis an updated status report of current investor interest.
- KCR and LV will supply to ACS information on a regular basis on current developments relating to marketing the fund/s.
- KCR and LV will help shape the PPM if necessary along with advice from counsel.

- 1 -

# **HEDGE**CONNECTION

ACS will provide all necessary legal documents in a timely fashion including but not limited to a Private Placement Memorandum. ACS will also support the marketing effort by keeping KCR and LV aware of all pertinent developments to the fund/s and providing appropriate marketing materials. ACS will cooperate fully with KCR and LV including travel to meetings and follow up with potential fund/s investors.

ACS and their attorneys will be responsible for the legal accuracy and completeness of the offering materials supplied to the prospective investors including the Principals prior investment performance.

**Payment:**
KCR and LV traditionally receive a monthly retainer of $6000 that is used to cover expenses including, but not limited to, out of pocket expenses for Federal Express, postage, mailings, travel, meals, entertainment and other significant expenses. This retainer will be credited against the fees received on capital that is raised by KCR and LV.

KCR and LV can be compensated in one of two ways:

A one-time finders fee of 2% on all new investments which are payable upon the execution of the investment

OR

20% on all fees for all new investments for a period of 5 years which shall be payable only as and when the corresponding management and performance fees are actually received by ACS

ACS agrees to retain KCR and LV as marketing consultant for the duration of the capital raising period. Either party upon giving 60 days notice may cancel the agreement. At the termination of this agreement, either by its natural expiration or by the request of either party, ACS agrees to pay KCR and LV its finders fee according to the terms set forth above, for any monies raised from those clients contacted by KCR and LV for up to one year after the termination of this agreement. KCR and LV will furnish to ACS a list of prospective investors that it has contacted upon the termination of this agreement.

- 2 -

# **HEDGE**CONNECTION

KCR and LV will treat information that is sensitive and proprietary to the fund/s in a confidential manner and will not use such information without approval of the Funds.

This letter is meant to be a starting point and outline of how we will work together to raise capital for ACS' new hedge fund product. We would like to insert boilerplate legal qualifications related to indemnification, audit provisions, correct entity names etc. into a contract format.

We look forward to working with your group in building your new hedge fund product.

Best,
Lisa Vioni
Walter Kirkland

# EXHIBIT F

**From:**   Lisa Vioni [lvioni@hedgeconnection.com]
**Sent:**   Monday, May 14, 2007 11:00 AM
**To:**     Russ Jeffrey
**Subject:** Re: Update

Russ,
I did indeed have a nice weekend. The weather here is starting to get pretty warm, but the walks on the beach are worth it.

I agree that we should be able to convince ACAS to have a BD. According to my lawyer it will take about 4-6 months at the most to create. However, once we get the ball rolling I believe that I can take my Series 7 and attach it to the BD we are creating.

In addition to everything we have discussed, I am interested in launching a premium Hedge Connection service which needs to be attached to the BD. It would be a platform for all hedge funds...but to be on the platform the hedge fund has to sign an agreement that says that if they get an allocation they must pay 5% of all fees for 5 years. We can use the Hedge Connection technology to accomplish giving an easy way to post the information so we can source good opportunities for investors that have investment mandates quickly. This is a great way to scale the third party marketing model. Currently third party marketers can only cover 3-5 hedge funds. With my technology and this platform we can cover every hedge fund and get paid fees on every allocation. It could be extremely profitable. It has to be separate from my current Hedge Connection platform because it will be part of a BD. The current HC platform revenues are based on subscription fees, advertising fees and licensing fees. It is proving to be extremely profitable as well.

You have asked me if I want to start outlining details of how I get compensated for the ACAS deal and the new credit fund etc. I do think that is a prudent thing to do. I would like to start outlining a general letter of understanding of how I will be compensated for the ACAS deal and the money that has been raised or will be raised by me for the new credit fund. I know that we have spoken about some terms, but I think that it makes sense to try to outline it a little more clearly. I would be comfortable stating that the details will be determined when you know how ACAS will structure your deal but acknowledges that my compensation will be similar to the normal pattern of compensation of general industry practices for a person that raises money in the hedge fund industry etc.

I am around all week. Let me know if you hear anything else from ACAS.

Lisa


On 5/14/07 10:35 AM, "Russ Jeffrey" <russ.jeffrey@Providenceinvestment.com> wrote:

    Lisa,
    Hope that you had a nice weekend.
    We are finishing up the most recent request from ACAS. We should have something for them late today or 1st thing in the morning.
    As far as the broker-dealer, I think we can create an up and running entity in fairly short order- and, with multiple opportunities- raising capital, selling CDO equity, smaller banking deals, advisory, etc. This would be a great and natural fit for ACAS so I think the prudent approach is to see how they come back. My sense from ACAS is that they want to be aggressive in the mortgage space and there are a lot of ways for them to express that.
    I am around all week and we can get caught up at your convenience.

    Russ

Re: Update

Lisa Vioni
President
Hedge Connection Inc.
603 Longboat Club Road  #504N
Longboat Key, Florida 34228
Phone:  941 383 9768
Cell: 917 756 1328
lvioni@hedgeconnection.com
http://www.hedgeconnection.com

# EXHIBIT G

| | |
|---|---|
| **From:** | Grunewald, Bob |
| **Sent:** | Tuesday, July 17, 2007 9:28 PM |
| **To:** | Lisa Vioni |
| **Cc:** | Russ Jeffrey |
| **Subject:** | RE: Follow up to phone call |

Lisa,

We should talk Thursday given my travel schedule. However, ACAS does not pay fees other than those for a retained search for the introduction of employees. I also do not expect to pay any fee for capital that ACAS invests as an LP. As Russ will confirm for you, we have no interest in making LP investments other than as a means of facilitating the generation of 3rd party capital. We do however believe we can generate value for our shareholders as we develop asset management businesses where we are paid fees for managing 3rd party capital. Your introduction of Russ puts us on the verge of creating a fund where we will need to raise this capital. I would propose that this introduction should give you a right of first refusal to help us raise this capital on terms consistent with those our treasury dept would otherwise receive. I will defer to Russ to delineate between capital that he has already circled and capital introductions that you have or will make. I am hopeful that the meeting on the 25th will provide the venue for a broader relationship with you beyond this one transaction.

---

**From:** Lisa Vioni [mailto:lvioni@hedgeconnection.com]
**Sent:** Tuesday, July 17, 2007 8:24 PM
**To:** Grunewald, Bob
**Subject:** Follow up to phone call

Bob,

I left a message for you earlier. I know you are traveling so in the interest of time, I have outlined what industry standard would be as payment for the deal you are about to close with PIM. I see payment as two different things:

1. Marketing fees for PIM's new funds: The marketing fees for the new funds get paid out of the PIM Fund's P&L. So if ACAS pays 2% and 20% on the money they invest into the fund, then PIM would pass some percentage of the management fee to the marketing person responsible for the introduction each year that the money is in the fund. Since you have not described to me the fee structure that you have finalized with Russ, I can not be more specific. But this is normal industry standard. Russ knows this and should have no problem carving my fee out of the fees he receives.

2. ACAS fee: I have introduced a key team of executives that are joining ACAS. A department is being developed and ACAS will have access to this group and all of the opportunities including but not limited to their expertise and potential investor introductions (like the potential investment from the RI treasurer). The fee that you pay for this service is one that you are probably more familiar with. Whatever you traditionally pay for this type of service is what I would accept.

I would like to get some outline from you and/or Russ before I make a presentation to ACAS on July 25th about working together. I think it is prudent business practice for all of us to be on the same page before moving forward with any other strategic partnerships. Also, it would be helpful if you could outline for me what ACAS' expectation is for paying the new marketing platform. Like everything else, there is an industry

standard for how internal marketing people get compensated.  It typically is based on a combination of salary, commission and bonus.  When possible, it may also include ownership in the firm.

Please call to discuss.
Best,

Lisa Vioni
President
Hedge Connection Inc.
603 Longboat Club Road  #504N
Longboat Key, Florida 34228
Phone:  941 383 9768
Cell: 917 756 1328
lvioni@hedgeconnection.com
http://www.hedgeconnection.com