UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
LISA VIONI, et al.,

                Plaintiffs,

   - against -

AMERICAN CAPITAL
STRATEGIES LTD., et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 26, 2011

08 Civ. 2950 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

Lisa Vioni and Hedge Connection Inc. ("HCI") (collectively, "Vioni")[1] bring this quantum meruit action against American Capital Strategies Ltd. ("Capital"), Providence Investment Management LLC and Providence Investment Partners LLC (together, "Providence"), and Russell Jeffrey ("Jeffrey") (collectively "Defendants"). Vioni claims that she had two separate agreements with Capital and Providence, respectively, to act as a finder for new business opportunities; that she satisfied her obligations to each by introducing them to each other; but that neither Defendant compensated her for these services.

Defendants now move for summary judgment under Fed. R. Civ. P. 56. They contend that (1) Vioni's quantum meruit claim fails because the emails allegedly constituting her agreement with Defendants do not satisfy New York's Statute of Frauds; and (2) Vioni had no reasonable expectation of compensation prior to arranging the introduction. Defendants also move under 28 U.S.C. § 1927, and the Court's inherent power, to sanction Vioni's attorney, Michael Q. Carey ("Carey"), for conducting eight wasteful depositions. For the following

---

[1] HCI is wholly owned by Vioni, and "Vioni, individually, took the actions alleged in this amended complaint." (Am. Compl. ¶¶ 6-7.) While Providence asserts that HCI "did not perform any of the services that are the subject of this action," (Providence Mem. in Supp. 1), Vioni maintains that there is a question of fact as to who provided the services. (Pl. Mem. 26.) Since the motion for summary judgment is granted, this dispute is moot.

1

reasons, Defendants' motions are GRANTED.

## BACKGROUND

In late 2006, Robert Grunewald—Managing Director of Capital, a publicly traded investment corporation—contacted Vioni for advice in creating an asset management business, and ultimately decided to partner with a hedge fund. Vioni presented various marketing proposals to Capital, which it did not utilize; she does not assert a claim for these services.

Around the same time, Vioni contacted her longtime professional colleague, Jeffrey, who was Chief Executive Officer and Chief Investment Strategist of Providence, a small investment management company. Providence was looking for an investor in a newly formed hedge fund. Vioni gave Jeffrey advice on marketing materials and introduced him to potential investors.

In April 2007, Vioni introduced Grunewald and Jeffrey by conference call. After an initial meeting, which Vioni arranged and attended, Capital expressed interest in acquiring Providence. The two companies began negotiating a series of transactions (referred to as the "ACSL Transactions") through which Capital would acquire Providence's investments, funds, clients, and employees. Vioni claims that during the course of these negotiations, Capital (through Grunewald) and Providence (through Jeffrey) repeatedly assured her that she would be compensated for her efforts once the ACSL Transactions were finalized. According to Vioni, these assurances were made both verbally and by email.

The ACSL Transactions were completed in September 2007. Capital hired Providence's employees, including Jeffrey, whom it placed in charge of a new mortgage-backed securities investment team. Providence and Jeffrey also moved their investments, funds, and future business opportunities to Capital.

According to Vioni, despite their earlier oral and written representations that she would

be compensated for her role in facilitating the ACSL Transactions, neither Defendant paid her for her work.

On March 20, 2008, Vioni commenced this lawsuit. On July 24, 2008, she filed an Amended Complaint, asserting causes of action for breach of contract, quantum meruit, and promissory estoppel. On January 23, 2009, the Court dismissed Vioni's breach of contract and promissory estoppel claims. The Court denied defendants' motion to dismiss her claims for quantum meruit. Vioni v. Am. Capital Strategies, Ltd., No. 08 Civ. 2950(PAC), 2009 WL 174937, at *5 (S.D.N.Y. Jan 23, 2009).

On September 30, 2010, Defendants moved for summary judgment on the grounds that (1) the email exchanges supporting Vioni's quantum meruit claim do not satisfy the Statute of Frauds; and (2) even if they did, there is no evidence that Vioni had a reasonable expectation of compensation at the time of the introduction. (Capital Mem. in Supp. 13; Providence Mem. in Supp. 13.)

**DISCUSSION**

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim demonstrating that it is entitled to relief. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a genuine dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (internal quotations omitted).

A claim in quantum meruit has the following requirements: (1) "the performance of

3

services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefore, and (4) the reasonable value of the services." Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (internal quotations omitted).

## I. Statute of Frauds

Defendants move to dismiss these claims as barred by the New York Statute of Frauds, which provides:

> a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, as subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
> . . .
> 10. Is a contract to pay compensation for services rendered in negotiating . . . the purchase, sale, exchange, renting or leasing of . . . a business opportunity, business, its goodwill, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. **"Negotiation" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction.** This provision **shall apply to a contract implied in fact or in law to pay reasonable compensation** . . . .

N.Y. Gen. Oblig. Law § 5-701(a)(10) (emphasis added).

"In an action in quantum meruit . . . , for the reasonable value of brokerage services, if it does not appear that there has been an agreement on the rate of compensation, a sufficient memorandum need only evidence the fact of plaintiff's employment by defendant to render the alleged services. The obligation of the defendant to pay reasonable compensation for the services is then implied." Morris Cohon & Co. v. Russell, 23 N.Y.2d 569, 574-75 (1969); see Kopelowitz & Co., Inc. v. Mann, 2009 WL 1037734, at *8 (Sup. Ct. Kings County Apr. 17, 2009). A series of correspondence and memoranda may constitute an agreement that satisfies the Statute of

4

Frauds. Bronner v. Park Place Entm't Corp., 137 F. Supp. 2d 306, 311 (S.D.N.Y. 2001) (citing Crabtree v. Elizabeth Arden Sales Corp., 110 N.E.2d 551 (N.Y. 1953)).

      Defendants contend that (1) their emails with Vioni show that they never reached a final agreement on the issue of payment for the introduction of Capital and Providence; and (2) any email negotiations about fee arrangements concerned prospective capital-raising services, which were never performed, not the introduction. (Capital Mem. in Supp. 13; Providence Mem. in Supp. 13.)  Since a quantum meruit claim does not require that the parties reach a final agreement as to compensation, the Statute of Frauds does not require that this term be in writing. Morris Cohon, 23 N.Y.2d at 575-76; Papaioannou v. Britz, 139 N.Y.S.2d 658, 662 (N.Y. App. Div. 2d Dept. 1955) ("As to consideration, it has been said that it need not be expressed in any particular terms; it is sufficient if it appears by fair or necessary inference." (internal quotations omitted)).  Had the parties done so, Vioni might have a viable breach of contract claim.  Instead, this case is proceeding under quantum meruit because no final agreement as to payment was reached.  Accordingly, Vioni must only produce writings indicating that Defendants requested her services, and that "the parties reasonably expected that such services were not to be performed gratuitously." Shapiro v. Dictaphone Corp., 411 N.Y.S.2d 669, 673 (N.Y. App. Div. 2d Dep't 1978).

      Defendants are correct, however, that the writings provide no assurance that they accepted Vioni's offer to introduce Providence and Capital, with the understanding that she expected compensation. Vioni first contacted Jeffrey, whom she had known professionally for over 15 years, discussing the growth of her company's website, and making herself available if he "want[ed] to bounce anything off" her. (Providence Mem. in Supp. at 4; Vioni Aff. ¶ 28.) Given their long-term, mentorship relationship, (56.1 St. ¶ 31), there is no indication that Vioni

5

was working <u>for</u> him, as opposed to <u>with</u> him, in order to further her own prospects.  The only writing in which Jeffrey acknowledges Vioni's expectation of compensation concerns an entirely different transaction, for a potential investment in PIM funds that never occurred. (<u>See</u> Klausner Decl. Ex.15).  As to the Capital-Providence introduction, Jeffrey simply states that they should meet to "iron out more specifics." (<u>See</u> Aaron Decl. Ex. Q.) This vague offer to meet and talk does not create a genuine dispute as to whether Jeffrey accepted Vioni's offer to introduce him to Grunewald with the understanding that she expected compensation.

      As to Grunewald, the emails indicate that he initially approached Vioni to "potentially be of help in helping [him] to think through how to raise capital for" the hedge fund he planned to create at Capital. (Walsh Decl. Ex. CC.)  The presentations and outlines she prepared for Grunewald did not include introducing Capital to hedge fund managers; they focused on marketing to investors—HCI's specialty. (Aaron Decl. Ex. B.)  Vioni does not dispute that Capital did not accept her bid to perform these marketing services. (Aaron Decl. Ex. E, at 208:23-208:25.) Although two emails show that Grunewald accepted Vioni's offer to arrange the introduction, (Aaron Decl. Ex. O, P), there is no indication that he understood he was employing her in this respect.  The introduction appears incidental to Vioni's interest in securing her own capital-raising role in Capital, and Vioni did not express any expectation of compensation in her offer to arrange this introduction.

      Moreover, the only two emails that Vioni offers as evidence of Grunewald's appropriation of her introductory services indisputably shows him discussing payment for future capital-raising services. (<u>See</u> Aaron Decl. Ex. R.)  On April 19, 2007, Vioni first discusses with Grunewald her payment for the introduction; she specifies that she was "formulating [her]

6

payment <u>from</u> <u>Russell</u> for this acquisition."[2] (Aaron Decl. Ex. R (emphasis added).) This admission contradicts any argument that she expected Gruenwald compensate her for the introduction. Vioni's email continues that the framework of the Providence-Capital deal would affect the form of payment she received from Jeffrey. No more is said regarding the introduction.

In the second paragraph of this email, Vioni proposes a consultancy agreement with Capital, stating that she is seeking Grunewald's "guidance" so that she may "participate in the growth of the business." (<u>See</u> Aaron Decl. Ex. R.) She does not state that she is formally requesting payment she believes to be rightfully hers, as compensation for past services. Grunewald replies that "the only realistic way to work out a fee arrangement would be as a straight advisory fee or a commitment on our part to use you for a bigger opportunity than would have otherwise existed." (<u>See</u> Aaron Decl. Ex. R.) Grunewald is clearly responding to a proposal for future consultancy services, which never occurred. There is no other reasonable interpretation of this email.

Indeed, it is not until July 17, 2007—three months after the introduction—that Vioni discusses in writing payment from Capital for the introduction. Grunewald flatly repudiates any obligation to pay Vioni for the introduction, informing her that "[Capital] does not pay fees other than those for a retained search for the introduction of employees." (Aaron Decl. Ex. Y.) This email corroborates his argument that Vioni arranged the introduction in order to secure prospective capital-raising opportunities: "[Vioni's] introduction [of Capital to Providence] should give [her] a right of first refusal to help [Capital] raise this capital on terms consistent with those our treasury dept would otherwise receive." (Aaron Decl. Ex. Y.) While the Statute of

---

[2] While Vioni informed Grunewald that she sought compensation from Jeffrey, Jeffrey was not copied on that email. Like the other emails, therefore, it only evidences Vioni's desire for compensation from Jeffrey, but is silent as to Jeffrey's understanding that he would be compensating her.

Frauds does not require that the writing itself predate the services, the writing must indicate that there was a reasonable expectation at the time they were rendered. Weitnauer Trading Co. v. Annis, 516 F.2d 878, 880 (2d Cir. 1975); Bloomgarden v. Coyer, 479 F.2d 201, 212 n.66 (D.C. Cir. 1973). For an act as ambiguous as introducing colleagues—which could be a friendly courtesy or a professional service—retroactive requests speak little to the recipient's state of mind at the time of the service.

The emails are entirely one-sided. They show that Vioni expected, or desired, some compensation, but reflect nothing about the Defendants' understanding. While Defendants did accept her introductory services, the focus of their professional relationship was on Vioni's capital-raising and marketing, not introductory, services. In this context, the introduction appears to be a minor happening, incidental to a larger deal that was never consummated. Absent some documentation that Defendants understood this act to be a professional service, as opposed to a courtesy that might position Vioni to benefit from future, compensable employment or other financial opportunities, there is no viable quantum meruit claim.[3]

Accordingly, the Statute of Frauds bars this claim from proceeding. No reasonable juror could conclude that these writings provide assurance that Capital and Providence employed Vioni's introductory services with the understanding that she expected compensation. As a result, the Court need not consider whether such expectation of compensation would have been reasonable.

## II. Sanctions

Defendants move, under 28 U.S.C. § 1927 and the Court's inherent power, to sanction

---

[3] Defendants discuss Vioni's distinction between "lift-out" services, performed in connection with Capital's hiring of Jeffrey and eight other Providence employees, and "marketing" services, based on introducing investors to funds managed by Providence. (Providence Mem. in Supp. 1-2.) Vioni does not dispute Providence's assertion that none of the investors introduced by Vioni actually invested in any such funds. (Providence Reply 4.) Accordingly, the only claimed basis for recovery is Vioni's introduction of Capital and Providence.

Mr. Carey for the following allegedly unnecessary and wasteful depositions: from Providence, Michael Owens, Richmond Jeffrey, Raymond Yu, and Ed Smith; and from Capital, Malon Wilkus, John Erickson, Thomas McHale, and Chris Sajewicz.[4] The statutory standard for sanctions is that the "attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." Vacco v. Operation Rescue Nat'l, 80 F.3d 64, 72 (2d Cir. 1996) (internal quotations omitted). The Court also has inherent authority to sanction a party or her attorney where either "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59 (1975) (internal quotations omitted). Both grounds for sanctions require a showing of bad faith. Oliveri v. Thompson, 803 F.2d 1265, 1273 (2d Cir. 1986).

Mr. Carey does not dispute that these witnesses have minimal knowledge of Defendants' interactions with Vioni. Rather, he argues that their depositions were necessary to calculate Vioni's fee, which includes the Providence employees' compensation from Capital that is not disclosed on their W-2 forms; and to elicit information about Capital's document retention and information technology ("IT") systems, in order to determine whether Capital violated its discovery obligations by allegedly failing to produce certain emails. (Pl. Mem. at 34.)

In the face of Mr. Carey's demand for more and more, wider and wider, and hope-springs-eternal discovery, the Court warned him that he would be sanctioned if the depositions were not meaningful and productive. At the March 4, 2010 conference, the Court stated, "I assume that you're proceeding on a good faith basis. I have no reason to quarrel with that or

---

[4] Providence does not seek sanctions for the remaining Providence depositions—Russell Jeffrey's and the Rule 30(b)(6) corporate deposition. Capital has offered no arguments in support of sanctions for the remaining Capital depositions—Jason Campbell, Lionel Ferguson, and McHale's Rule 30(b)(6) corporate deposition—so they will not be considered. The Court does, however, consider Capital's arguments concerning McHale's individual deposition. Vivian Garcia-Tunon's deposition was noticed but never occurred, so she also is not a subject of this motion.

9

question that. But to prove that good faith basis, you got to be able to get something from these people that makes some sense. Now you've heard from [Capital's attorney] that [these witnesses] don't know anything about it. If their answer is they don't know anything about it, then you've wasted their time." (Tr. 26:23-27:5, Mar. 4, 2010). The Court reiterated that there would "be consequences" if Mr. Carey did not "get relevant information." (Id. at 28:6-28:7). In addition, after Mr. Carey informed of his intent to depose "Mr. Jeffrey and . . . one or two others from the company," the Court instructed him to "start with Jeffrey" in order to proceed more efficiently with the other depositions, to which he responded that he "ha[d] no objection." (Id. at 31:13-31:14.) The Court also specifically directed Mr. Carey to reassess the testimony that was still needed following each deposition. (Id. at 31:5-31:6, 33:19-33:24.) By the May 13, 2010 conference, Mr. Carey had noticed "three or four depositions." (Tr. 8:2-8:3, May 13, 2010.) The Court again admonished Mr. Carey of sanctions, if the depositions were not meaningful and productive. (Id. at 9:8-9:9, 16:25-17:3, 33:19-33:24 ("[If the depositions are] just rambling through, there'll be consequences in the form of sanctions. I repeat that.").

     Despite these warnings, Mr. Carey made no attempt to target his inquiries or proceed in a deliberate manner. Indeed, he seemed to proceed in the opposite direction, beginning at some length with those who knew the least, before proceeding with the key witnesses (i.e., Russell Jeffrey and the Rule 30(b)(6) corporate representatives). He also subjected each witness to the whole gamut of questioning. The few examples of arguably relevant testimony that Mr. Carey elicited from the minor witnesses—additional forms of compensation and compliance with discovery obligations—account for only a small percentage of his total questioning.

     The depositions of Richmond Jeffrey, Owens, Erickson, and Wilkus each lasted nearly the full 7 hours called for in the Federal Rules. Yu's deposition lasted approximately 5 hours,

McHale and Smith's less than 3. The record indicates that minimal time was spent on Vioni's services. Richmond Jeffrey was not questioned about Vioni until page 179 of a 275-page transcript; Yu until page 34 of a 148-page transcript; and Erickson until page 144 of a 348-page transcript. McHale was questioned for two days—in his corporate capacity and individually—but never about Vioni. Wilkus was not questioned about Vioni until page 172—almost halfway through the 368-page deposition. He testified that he had not met or communicated with Vioni before that day, and was unaware of her claim for compensation before this lawsuit. (See Walsh Decl. Ex. N, at 367:13-368:6.)

Indeed, Mr. Carey only sought these witnesses' testimony for a few narrow legal issues, and they proved to be of limited use. For example, Mr. Carey admitted that he "wouldn't be surprised" if Wilkus "didn't know anything about the introduction," and sought only to inquire about "what came of the introduction" in calculating its reasonable value. (Tr. 27:13-27:19, Mar. 4, 2010.) He questioned Wilkus about a forgiven contractual obligation, deferred compensation, and other possible benefits that would not appear on a W-2, in order to calculate the reasonable value of the introduction. While Mr. Carey was entitled to pursue this line of questioning, the information asked and received did not warrant seven hours. Capital had already represented that it had produced documents reflecting the full amount of compensation paid to the former Providence employees, (Walsh Decl. ¶ 9); certainly no more than an hour of questioning was needed to determine whether the witness had any contrary information. Indeed, Mr. Carey took up 60 pages on background questions and Wilkus's personal employment history, asking follow up questions about previous jobs on a fishing boat, a shrimp business, and a noodle factory. (Walsh Decl. Ex. N, at 16-58). The remainder concerns Capital's structure and investments, including certain investment vehicles to which Vioni concedes she never introduced any third

party investors. (Walsh Ex. H, Resps. 5 & 6.) Erickson and McHale, who met Vioni briefly and had no written communications with her, were primarily questioned about the same aspects of Capital's structure and investments that Wilkus had already extensively addressed. (See Walsh Decl. ¶¶ 33, 37-39, 43, 44.)

Similarly, Richmond Jeffrey, Yu, Smith, and Owens had little to no contact with Vioni. Mr. Carey spent the majority of their depositions on the same topics posed to Wilkus, Erickson, and McHale; irrelevant questions about their training and work experience; and inquiries about Jeffrey's state of mind, which the witnesses could not be expected to know and were better put directly (and initially) to Jeffrey. While some level of corroboration or contradiction is helpful, there was no excuse for deposing these minor players for so long and in such an obviously inefficient manner.

Likewise, Chris Sajewicz was deposed for approximately 5 hours about Capital's document retention practices and IT systems. Mr. Carey argues that this inquiry was relevant to Capital's alleged failure to produce certain emails—a narrow issue that could have been addressed in less than half the time.

While Vioni and her counsel are entitled to extract information that may be relevant to the reasonable value of Vioni's services, this does not justify or excuse redundant questioning on topics that are irrelevant or that the witness cannot be expected to know. In other words, Mr. Carey has failed to rebut Defendants' demonstration that his depositions were unjustifiably protracted. Moreover, Mr. Carey's decision to conducting these depositions before taking the major witnesses' testimony, cannot have been made in good faith. His decision was made with complete disregard for the Court's instruction that he begin with Jeffrey's deposition to avoid wasting time.

After reviewing the transcripts of these eight depositions, the Court concludes that an average of 3 hours per deposition was wasted on the depositions of Michael Owens, Richmond Jeffrey, Malon Wilkus, and John Erickson; and two hours were wasted on the depositions of Raymond Yu and Chris Sajewicz. This estimate is conservative and applies jointly to Capital and Providence. The Court does not impose sanctions for Thomas McHale's individual deposition or Ed Smith's deposition, as each lasted less than 3 hours. Accordingly, the Court imposes sanctions of $400 per wasted hour, or $6,400 total, to be shared among moving counsel.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment are GRANTED, and Plaintiffs' attorney Michael Q. Carey is sanctioned $6,400. The Clerk of Court is directed to close this case.

Dated: New York, New York
       September 26, 2011

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge