USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 2, 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

LISA VIONI,

         *Plaintiff*,

   -against-

PROVIDENCE INVESTMENT MANAGEMENT,
LLC *and* RUSSELL JEFFREY,

         *Defendants*.

------------------------------------------------------------------X

08 Civ. 2950 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

On March 13, 2017, a jury trial began on Lisa Vioni's quantum meruit claim against Russell Jeffrey and Providence Investment Management, LLC ("PIM" and together with Jeffrey, "Defendants"). Vioni had arranged an introduction between Jeffrey and Robert Grunewald of American Capital Strategies ("ACAS"). ACAS eventually hired Jeffrey and eight PIM employees, and Vioni seeks compensation from Defendants for her introduction of the two groups.[1] Following a four-day trial, the jury found in Vioni's favor and awarded her $750,000.

Defendants renew their motion pursuant to Fed. R. Civ. P. 50(b)(3) for judgment as a matter of law ("JMOL"), and alternatively move pursuant to Fed. R. Civ. P. 59 for a new trial or remittitur. The Court grants Defendants' JMOL motion because there was no evidence of the reasonable value of Vioni's services; the jury's findings must have been the result of sheer surmise or

---

[1] Vioni also asserted a quantum meruit claim against ACAS in this action. However, the Court granted ACAS's motion for summary judgment based on the Statute of Frauds, in part because Grunewald "flatly repudiate[d] any obligation to pay Vioni for the introduction" after she wrote to ACAS regarding payment. *Vioni v. Am. Capital Strategies Ltd.*, 08 Civ. 2950 (PAC), 2011 WL 4444276, at *4 (S.D.N.Y. Sept. 26, 2011). The Court also granted Jeffrey, PIM, and Providence Investment Partners LLC's (together the Providence Defendants) motion for summary judgment based on the Statute of Frauds. *See id.* at *5. The Second Circuit affirmed the Court's dismissal of Vioni's claim against ACAS, but reversed the Court's dismissal of Vioni's claim against the Providence Defendants. *Vioni v. Am. Capital Strategies, Ltd.*, 508 F. App'x 1 (2d Cir. 2013) (summary order).

conjecture. The Court also conditionally grants Defendants' alternative motion for a new trial on damages because the jury's award of $750,000 was a seriously erroneous result and a miscarriage of justice. If the Court's decision on Defendants' JMOL motion is reversed or vacated, Vioni may choose between a new trial on damages or remittitur reducing the award to $150,000.

## BACKGROUND

In this quantum meruit action, Vioni seeks compensation for introducing Jeffrey and Robert Grunewald, leading to ACAS hiring Jeffrey and eight PIM employees. On March 17, 2017, after a four-day trial, a jury returned a verdict against Defendants and in favor of Vioni in the amount of $750,000. Dkt. 199. The evidence at trial included e-mails, agreements, a recording of a telephone call, and testimony from seven witnesses, including Jill Niemczyk, an expert in the field of executive search and recruitment.

The evidence established that Vioni and Jeffrey first met when Vioni started working in Jeffrey's division at Prudential Securities in 1990. Tr. 78–80. Vioni came to see Jeffrey as a mentor. Tr. 80, 82. Both moved on from Prudential, and were in and out of touch over the years. Tr. 81–82, 230, 315. In 2006, Jeffrey and Vioni reconnected. Tr. 315. Jeffrey owned PIM, which was the general partner of a hedge fund; and Vioni was the CEO of Hedge Connection, Inc. ("HCI"), a website that provided a way for hedge funds and investors to meet. *See* Tr. 101, 233, 296, 427. They discussed the looming subprime mortgage crisis and how Jeffrey wanted to take advantage of what he saw as an opportunity to make money. *See* Tr. 92–93. Jeffrey needed ready access to large amounts of capital fast, and he was open to a number of alternatives, including selling a part of PIM, merging with another company, or obtaining investments. Tr. 93, 96; *see also* Ex. 132. Vioni then started thinking about people she could introduce to Jeffrey. Tr. 94.

Vioni contacted Jay Chapler, who represented a multibillion-dollar family office in

Canada. Tr. 95. Chapler was interested in investing hundreds of millions of dollars into hedge funds by buying a part of the hedge funds. *Id.* On March 25, 2007, Vioni introduced Jeffrey to Chapler by e-mail, and on March 26, 2007, the three talked by phone. Tr. 241–42. Also on March 26, 2007, after the call with Chapler, Jeffrey sent Vioni an e-mail stating: "we should also have a discussion about financial considerations. I want you to have a comfort and confidence about this whole process, so that if a deal is consummated, you are compensated accordingly." Tr. 242–43; Ex. 9. The Chapler introduction did not lead to a deal. Tr. 97, 392.

Vioni was also in contact with Robert Grunewald of ACAS. Tr. 236. Grunewald was looking to buy part of a general partner that managed a hedge fund, or to make a substantial investment in a hedge fund. Tr. 236–37. On approximately April 4, 2007, Vioni introduced Jeffrey and Grunewald by phone. Tr. 129. On April 18, 2007, Vioni, Grunewald, Jeffrey, two PIM employees, and two ACAS employees met in a New York board room that Vioni rented. Tr. 135, 330–31. The meeting appeared to go well, and it seemed possible that a deal could be reached where ACAS would purchase PIM and fold it into ACAS. Tr. 137.

On April 19, 2007, Vioni sent Grunewald an e-mail stating: "In formulating my payment from Russell for this acquisition I need to understand how his group will be folded into AC[AS]. For example, if the other group I introduced him to ended up doing the deal we had proposed, I would have gotten an upfront fee and then ownership in the entire holding company." Ex. 15. Also on April 19, 2007, Vioni wrote to Jeffrey: "I would like to get a little more specific as soon as we can with how the deal between you and me will work. I agree that there should be a significant upfront payment for the introduction to AC[AS] and then that I should be tied to the growth of the business going forward." Ex. 62. Jeffrey responded: "If I do go to NYC tomorrow, let's meet again if your schedule permits to iron out more specifics." *Id.*

3

Negotiations between PIM and ACAS continued. On June 5, 2007, Jeffrey sent Grunewald an e-mail with a proposed framework for a deal. Ex. 136. Attached to the e-mail was a document that noted: "Lisa Vioni expects payments for the initial introduction and for any capital that is managed for ACAS out of its newly created PIM office." *Id.* While negotiations were ongoing, Vioni continued her attempts to secure compensation. For example,

- On May 14, 2007, Vioni e-mailed Jeffrey to outline details of how she would be compensated for the ACAS deal. Ex. 21. She wrote: "I would be comfortable stating that the details will be determined when you know how ACAS will structure your deal but acknowledges that my compensation will be similar to the normal pattern of compensation of general industry practices for a person that raises money in the hedge fund industry etc." *Id.*

- On June 4, 2007, Vioni wrote to Jeffrey: "I hope to be compensated the way that any marketing person in our industry would be compensated for this type of introduction. A marketing person typically gets paid a percentage of fees on the money they raise usually in perpetuity. I view this deal as being no different and in fact more significant because the access to capital will be almost unlimited some ways. So in terms of how I should be compensated on this deal should be a combination of things. As we discussed, I think I should receive an upfront fee for the deal and then payment for the money that goes into the hedge fund from ACAS. I don't know how you work that into your deal with them…perhaps my fee would be part of your expenses? I am sure we can get to a place where we all feel comfortable." Ex. 22.

- On July 16, 2007, Vioni sent Jeffrey an e-mail stating: "I am feeling like I need to close the loop on the introduction I made between you and ACAS . . . . I really need to know how your deal proposes that I get compensated. It should be clearly written in your deal memo with indemnifications etc. . . . For example, if I am going to get paid according to industry standard on the introduction of you to ACAS, I don't necessarily want or need to sell any of [HCI] to ACAS." Ex. 24.

- On July 17, 2007, Vioni e-mailed Jeffrey: "Before I speak to [Grunewald], can you tell me if there is a reason that you didn't include my marketing fee when you were negotiating operating expenses, guaranteed salaries, guaranteed bonuses, options and upside for your group? My expectation was to be paid versus industry standard which would be some percentage of the management fee for some amount of years on all money that comes in from the investor introduction. Since [Grunewald] has said that ACAS will not pay for marketing according to industry standard, how will you go back to him now and get me paid out of your P&L? I really need you to clarify with me how I am included in your deal with ACAS. Since I did not get an engagement letter signed by you for the introduction and we only discussed it and always referred to industry standard, I must now rely on you to help negotiate marketing fees into your deal for me." Ex. 25.

4

- On July 17, Vioni wrote to Grunewald, in an e-mail she later forwarded to Jeffrey, that she saw her "payment as two different things." Ex. 26. First was marketing fees, and second was an "ACAS fee." *Id.* Vioni stated as to the ACAS fee: "I have introduced a key team of executives that are joining ACAS. A department is being developed and ACAS will have access to this group and all of the opportunities including but not limited to their expertise and potential investor introductions (like the potential investment from the RI treasurer). The fee that you pay for this service is one that you are probably more familiar with. Whatever you traditionally pay for this type of service is what I would accept." *Id.* Grunewald responded "ACAS does not pay fees other than those for a retained search for the introduction of employees." *Id.*

By August 10, 2007, PIM and ACAS had reached a deal, *see* Ex. 37–45, but not the one originally envisioned. Instead of ACAS buying, or investing in PIM, or its hedge funds, ACAS hired Jeffrey and eight PIM employees and paid their salaries and bonuses to work for ACAS. *See id.*; Tr. 168–69. However, Jeffrey and the PIM employees were able to continue to run the PIM hedge funds. *See* Tr. 168–69.

Defendants never paid Vioni for the introduction to ACAS.

## **DISCUSSION**

### I. **Judgment as a Matter of Law**

JMOL is appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [opposing] party on that issue." Fed. R. Civ. P. 50(a)(1). The Court "may set aside a jury's verdict where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against him." *Vangas v. Montefiore Med. Ctr.*, 823 F.3d 174, 180 (2d Cir. 2016) (internal quotation marks and alteration omitted). "In reviewing a Rule 50 motion, all credibility determinations and reasonable inferences of the jury are given deference and [the Court] may not weigh the credibility of witnesses." *Id.*

5

"In order to recover in quantum meruit under New York law, a claimant must establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (internal quotation marks omitted). Defendants argue that they are entitled to JMOL because Vioni failed to offer sufficient evidence relating to her expectation of compensation and the reasonable value of her services.

### A. Expectation of Compensation

Defendants launch several attacks on the sufficiency of the trial evidence of Vioni's expectation of compensation. They stress that the inquiry must focus on the expectations at the time that services were rendered, and that at that time, the evidence showed that Vioni expected compensation from Defendants only if an investor purchased PIM, or invested in PIM or a PIM hedge fund. Next, they argue, even if Vioni expected compensation from Defendants for an employment arrangement, her expectation was unreasonable. And finally, they contend that there was no evidence that at the time of Vioni's services, Defendants understood Vioni expected compensation from them for an introduction that led to employment.

These arguments are certainly appropriate; Defendants made them to the jury. But the jury rejected them. They fail here, as well.

#### 1. Vioni's Expectation of Compensation for Employment Transaction Introduction

Contrary to Defendants' assertions, there was sufficient evidence that at the time Vioni provided her services, she expected payment from Defendants for any deal that was consummated, and not just for an introduction leading to an investment or acquisition. When Jeffrey and Vioni reconnected in 2006, they discussed how to get Jeffrey access to large amounts of capital to take

6

advantage of the looming subprime mortgage crisis. There was evidence that Jeffrey was open to any alternative so that he would not be a spectator once the crisis hit; no one deal was identified as the only option Jeffrey would have pursued. It was in that context that Vioni introduced Jeffrey to potential deal partners.

Vioni first introduced Jeffrey to Chapler, and after meeting Chapler, Jeffrey wrote to Vioni on March 26, 2007 that they should "have a discussion about financial considerations." Ex. 9. Jeffrey wanted Vioni "to have a comfort and confidence about this whole process, so that if a deal [was] consummated, [Vioni was] compensated accordingly." *Id.* Jeffrey's e-mail does not specify that it was limited to only a deal with Chapler, and the jury could have credited Vioni and drawn an inference that Jeffrey was referring to any deal that Vioni helped Jeffrey consummate.

A day after the in-person meeting with Grunewald and Jeffrey on April 18, 2007, Vioni wrote to Jeffrey: "I would like to get a little more specific as soon as we can with how the deal between you and me will work." Ex. 62. She stated that "there should be a significant upfront payment for the introduction to AC[AS]." *Id.* Jeffrey responded: "If I do go to NYC tomorrow, let's meet again if your schedule permits to iron out more specifics." *Id.* And on June 5, 2007, Jeffrey sent Grunewald a document that noted "Lisa Vioni expects payments for the initial introduction and for any capital that is managed for ACAS out of its newly created PIM office." Ex. 136.

Moreover, Vioni testified at trial about her conversations with Jeffrey regarding the goal of the introductions: "[W]e both discussed that since we don't know what the transaction's going to be and since we don't know what the structure of the deal is going to be, that ultimately I would get paid based on the final structure that occurred, whatever structure it was." Tr. 100–01. With respect to the e-mail Jeffrey sent after the Chapler meeting on March 26, 2007 (*see* page 3, *supra*),

7

Vioni further testified: "I understood the e-mail was that he was writing to confirm that he was giving me comfort that he would compensate me for any deal." Tr. 130.

It is true that Vioni repeatedly framed her expectation for compensation from Defendants in terms of marketing fees. *See* Exs. 21, 22, 25, 26. That does not end Vioni's compensation expectation, however. It makes sense that Vioni would try to tailor her compensation requests to how and what she anticipated the deal would end up being. It certainly does not follow that in talking about one deal structure, she was implicitly foregoing compensation for any other deal structure. Further, although there was evidence that Vioni expected ACAS to pay her for an employment arrangement, *see* Tr. 231; Ex. 26, this does not compel the conclusion that Vioni was limiting herself to obtaining those fees solely from ACAS, to the exclusion of Defendants.

In view of the contemporaneous documentation and discussion, as well as the testimony at trial, there was sufficient evidence that Vioni expected payment from Defendants, regardless of the ultimate structure of the deal that followed from her introduction. It therefore cannot be said that there was "a complete absence of evidence" that Vioni expected Defendants to pay her for an introduction that led to an employment transaction, such that the jury's findings must "have been the result of sheer surmise or conjecture." *Vangas*, 823 F.3d at 180.

### 2. Reasonableness of Vioni's Expectation of Compensation

Defendants argue that Vioni's expectation of compensation was unreasonable based on the evidence at trial that candidates (job applicants) do not pay recruiters for their placement services. That may be so, but Defendants' argument conflates reasonableness of expectations with reasonable value of services. Defendants cite no authority suggesting that whether a plaintiff reasonably expects payment for her services must be determined solely by reference to whether the recipient normally pays for such services under industry standards, especially where there is no evidence that the plaintiff was aware of the industry standards at the time. The reasonableness

8

of Vioni's expectation here is more than adequately supported by the evidence that Vioni told Jeffrey on multiple occasions that she expected him to compensate her, and Jeffrey never said no (as ACAS did), and never objected. *See, e.g.*, Exs. 22, 26, 62; Tr. 441–42; *see also* Exs. 9, 136.

Second, there was, in fact, evidence that a candidate would be willing to pay a recruiter for a successful employment introduction. Vioni testified that she and a hedge fund manager had entered into an agreement in which the hedge fund manager agreed to pay Vioni a fee for introducing him to a potential employer. Tr. 188. Thus, assuming reasonableness of expectation is properly determined by reference to practices in the industry, there was sufficient evidence for the jury to conclude that Vioni's expectation of compensation was reasonable.

### 3. Defendants' Understanding of Vioni's Reasonable Expectation

Defendants contend that there was insufficient evidence that Defendants understood Vioni expected them to pay for her services. Vioni responds first by disputing that there is any requirement that such evidence be introduced at trial, and second by arguing that in any event the evidence at trial was sufficient.

Contrary to Vioni's first assertion, the Second Circuit previously held in this case that "[b]oth parties must understand that the party performing the services has a reasonable expectation of compensation for those services." *Vioni v. Am. Capital Strategies, Ltd.*, 508 F. App'x 1, 1 (2d Cir. 2013) (summary order); *see also Vioni v. Providence Inv. Mgmt., L.L.C.*, 648 F. App'x 114, 116 (2d Cir. 2016) (summary order); *Aluminum Fair, Inc. v. Abdella*, 456 N.Y.S.2d 184, 185 (3d Dep't 1982); *DiBella v. Hopkins*, 187 F. Supp. 2d 192, 201 (S.D.N.Y. 2002) (Chin, J.); *cf. Shapiro v. Dictaphone Corp.*, 411 N.Y.S.2d 669, 673 (2d Dep't 1978). This is logical. A plaintiff's expectation of compensation would hardly seem reasonable, if the defendant was kept in the dark about it.

However, for substantially the same reasons that there was sufficient evidence that Vioni

9

expected compensation for any deal that she helped Defendants reach (*see* Section I.A.1, *supra*), Vioni is correct that there was sufficient evidence of Defendants' understanding of her expectation of compensation.

**B.   Reasonable Value of Vioni's Services**

The reasonable value of services for a recovery in quantum meruit is "the amount for which [the] services could have been purchased from one in the plaintiff's position at the time and place the services were rendered, or the amount for which the defendant could have obtained services under like circumstances." *Carlino v. Kaplan*, 139 F. Supp. 2d 563, 565 (S.D.N.Y. 2001) (internal quotation marks and citations omitted). While reasonable value is commonly determined by reference to hourly rates and number of hours worked, a plaintiff may, in appropriate cases, prove the reasonable value of her services through "clear and accepted market place conventions." *Id.*; *see also Hershkowitz v. Think Tech Labs, LLC*, 651 F. App'x 15, 19 (2d Cir. 2016) (summary order). There was no proof of hourly rates or hours worked. Instead, Vioni opted to try to prove the reasonable value of her services through market place conventions.

There simply was no evidence at trial of any market place convention (general industry practices/industry standards) for what a candidate (like Jeffrey or the other PIM employees) would pay a recruiter (like Vioni) to place the candidate with a hiring institution (like ACAS). Vioni attempts to evade this gap in the evidence by arguing broadly that there was evidence of "the industry standard for employee placement." *See* Opp. at 19. True enough, but Vioni omits that the "industry standard" evidence described what a *hiring institution*—and not a candidate—would pay a recruiter for a successful placement in various circumstances. Niemczyk's testimony does not establish what a candidate would pay for a recruiter's services; Niemczyk testified that although she has "been involved either directly or indirectly with thousands of hires," Tr. 470, in

her "20 years of executive search and talent acquisition," she was "not familiar with any instance in which the candidate paid a fee," Tr. 474; *see also* Tr. 481. Niemczyk's testimony cannot support the verdict; indeed it contradicts the verdict. There is no basis in the record to impute to candidates the amounts a hiring institution would pay a recruiter. *See also* Tr. 208 (Former ACAS recruiting manager testifying that "candidate had no obligation to pay the recruiter" under ACAS recruiting contracts with recruiters).

The distinction between markets for candidates and hiring institutions is important for at least two reasons. First, it is not clear that a recruiter performs the same services when acting for a hiring institution, as she does when acting for a candidate. *Cf. Geraldi v. Melamid*, 212 A.D.2d 575, 576 (2d Dep't 1995) ("The plaintiff's reliance on the fact that he had been previously paid $5,000 a month as a consultant was insufficient to raise a triable issue in view of his failure to establish that he performed the same tasks for the defendant as he had performed in his previous position."). When a recruiter is searching for a candidate on behalf of a hiring institution, she likely will have to expend significant time and effort to find a candidate who is willing to be placed. On her next search for a hiring institution, the recruiter likely will not be able to place the same candidate who she already just placed; she will have to start her search for potential candidates anew. In contrast, if a recruiter is searching for a hiring institution on behalf of a candidate, the recruiter may not need to expend significant time and effort to find a hiring institution that is willing to hire. This is so because while candidates may only be willing to change jobs so often, hiring institutions may continually need new employees for a number of positions, so the recruiter may be able to keep going back to that same hiring institution to place candidates. *See* Tr. 476–77 (Niemczyk testifying that a recruiter might make an opportunistic introduction "to acquire a new client;" the recruiter "might hope that it opens dialogue around what their hiring needs are in

11

other areas so that [the recruiter] can later become engaged for a search to do that"); Ex. 169 at 6 (ACAS fee agreement for recruiting agency "from time-to-time to conduct assignments to identify candidates for potential employment"). Thus, a search may require vastly different amounts of time and effort depending on whether a recruiter is trying to find a hiring institution for a candidate or trying to find a candidate for a hiring institution. The evidence at trial was clearly insufficient to support the conclusion that a fee paid by a hiring institution for a successful placement is "the amount for which [Vioni's] services [for Jeffrey and PIM] could have been purchased . . . at the time and place the services were rendered." *See Carlino*, 139 F. Supp. 2d at 565.

Second, it stands to reason that a candidate would not pay the same rate as a hiring institution. A hiring institution may be able to pay a recruiter 30 percent of a candidate's first-year base salary and guaranteed or anticipated bonus without a substantial impact on its bottom line, but a candidate may not be willing to part with an equivalent amount of his earnings. *Cf. Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 n.1 (2d Cir. 1994) (recognizing that hourly rates may differ for a plaintiff depending on whether the plaintiff was an independent consultant or a full-time employee). It may be that as a matter of market place convention, candidates pay the same as hiring institutions, but no evidence at trial suggested that Defendants would have obtained Vioni's services at a hiring institution's rate. *See Carlino*, 139 F. Supp. 2d at 565 (reasonable value of services is "the amount for which the defendant could have obtained services under like circumstances"); *cf. Bradkin v. Leverton*, 257 N.E.2d 643, 645 (N.Y. 1970) (obligation implied under quasi contract claim "must conform to what the court may assume would have been the agreement of the parties if the situation had been anticipated and provided for"); *Economist's Advocate, LLC v. Cognitive Arts Corp.*, 01 Civ. 9468 (RWS), 2004 WL 2429804, at *3 (S.D.N.Y. Oct. 29, 2004) (analyzing whether expert had experience in relevant market in which plaintiff

participated, and not just whether the projects the expert and plaintiff performed were comparable).

Absolutely nothing in the record supports the conclusion that the market place conventions for candidates and hiring institutions that use recruiters' services are the same. That conclusion, necessarily reached by the jury, is sheer surmise and conjecture.[2] Defendants are entitled to JMOL.

## II. New Trial or Remittitur

Defendants move in the alternative, pursuant to Fed. R. Civ. P. 59, for a new trial or for remittitur. Although the Court grants Defendants' "renewed motion for judgment as a matter of law, it must also conditionally rule on [Defendants'] motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." Fed. R. Civ. P. 50(c)(1).

### A. New Trial

The Court can order a new trial under Rule 59(a), if it concludes "that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003) (internal quotation marks and alteration omitted). A Rule 59(a) motion differs from a Rule 50 motion because a trial judge can (1) grant a new trial "even if there is substantial evidence supporting the jury's verdict," and (2) "weigh the evidence . . . , and need not view it in the light most favorable to the verdict winner." *Id.* at 244–45.

In light of Rule 50(c)(1), the Court rules conditionally that it would grant Defendants' motion for a new trial, but solely on the issue of damages. There is sufficient evidentiary support for Vioni's expectation of compensation, as described above (*see* pages 6–10, *supra*). The same, however, cannot be said of the jury's award of $750,000. The verdict does not set forth how the jury arrived at its award of $750,000, but it is clear that the award is based on a calculation that

---

[2] The jury awarded Vioni $750,000, which, Vioni states, is "less than 23% of the first year's base salary and bonus compensation set forth in the offer letters and employment contracts" of Jeffrey and the eight PIM employees. Opp. at 20.

13

included the eight PIM employees and bonuses (or at least the bonus provided for in Jeffrey's February 2008 employment agreement, *see* n.4, *infra*).[3] This calculation is seriously erroneous and a miscarriage of justice for three reasons.

First, as explained above, Vioni failed to prove the reasonable value of her services.

Second, assuming that the reasonable value of Vioni's services can be calculated based on market place conventions for hiring institutions, the jury's award improperly includes fees for the eight PIM members that joined Jeffrey at ACAS. Niemczyk testified that "[u]nder industry standard, you'd only reasonably expect to be paid for . . . team members if you had individually recruited, interviewed, managed the interview process, and closed those hires." Tr. 480; *see also* Tr. 477–78. There was no evidence at trial that a recruiter would receive a fee for doing less. And, the evidence was compelling that Vioni did not perform those services for the eight PIM employees. *See, e.g.*, Tr. 252 (Vioni only talked with Jeffrey and Smith about "the possibility of them taking a position with" ACAS); Tr. 172 (Vioni did not provide ACAS with PIM employees' salary information); *see also* Tr. 428.

Third, again assuming that the reasonable value of Vioni's services can be calculated based on market place conventions for hiring institutions, the jury's award appears, in serious error, to include a fee based on Jeffrey and the eight PIM employees' bonuses. Niemczyk's uncontroverted testimony was that a recruiter could earn a fee based on a candidate's first-year base salary and guaranteed or anticipated bonus. *See* Tr. 399. She explained, however, that a conditional bonus would not be included in calculating a recruiter's fee, and that "[y]ou cannot pay an executive

---

[3] Vioni does not try to argue otherwise. *See* Opp. at 5. Nor could she. The award is greater than Jeffrey's entire first-year base salary ($500,000), and fully half of Jeffrey's first-year base salary and 200 percent guaranteed bonus provided for in his February 2008 employment agreement (total of $1,500,000). *See* Exs. 39, 46. There was no evidence that under industry standards, a recruiter could earn more than 30 percent of a candidate's first-year base salary and guaranteed or anticipated bonus.

14

search fee on an amount that you don't know whether it would be paid." Tr. 520. The bonuses set forth in Jeffrey and the PIM employees' August 2007 offer letters were all conditioned on at least $25 million being raised. *See* Exs. 38–45. The bonuses were neither guaranteed nor anticipated, according to Niemczyk's testimony on industry standards. No evidence at trial supports the jury's apparent inclusion of the bonuses in its calculation of Vioni's damages.[4]

**B.     Remittitur**

"Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir 2014). State law "governs the issue of the excessiveness of a jury award in a diversity case." *See Consorti v. Armstrong World Indus., Inc.*, 103 F.3d 2, 4 (2d Cir. 1996). N.Y. C.P.L.R. § 5501(c) provides[5]:

> In reviewing a money judgment in an action in which an itemized verdict is required by rule forty-one hundred eleven of this chapter in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.

In applying the "deviates materially" standard, "a district court reviews the evidence presented at trial in support of the challenged damage award and compares the award to other cases in which evidence of similar injuries was presented." *Presley v. United States Postal Servs.*, 317 F.3d 167,

---

[4] Vioni argues that Jeffrey's February 2008 employment agreement, which provided for a guaranteed bonus of 200 percent of his base salary, supports the jury's award. *See* Opp. at 24; Ex. 46 (agreement "made and entered into as of February 6, 2008"). Niemczyk testified, however, that a recruiter's fee is determined "[o]n the date the candidate shows up for employment;" later revisions to compensation are not factored in. Tr. 484; *see also* Tr. 516. There was no evidence to the contrary. Further, the $750,000 award is 30.43 percent of the eight PIM employees' first-year base salaries plus Jeffrey's first-year base salary and 200 percent bonus. *See* Exs. 37–46. This is outside the industry standard 20-30 percent range for recruiter fees, and moreover does not apply the declining discounts for team hires that Niemczyk identified. *See* Tr. 399; Tr. 487–88.

[5] "Although phrased as a direction to New York's intermediate appellate courts, § 5501(c)'s 'deviates materially' standard, as construed by New York's courts, instructs state trial judges as well." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 425 (1996).

15

173 (2d Cir. 2003).

It is not clear, however, that § 5501(c) applies here because this is not an action in which N.Y. C.P.L.R. § 4111 requires an itemized verdict. *See* N.Y. C.P.L.R. §§ 4111(d) and (e); *see also Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 532 & n.150 (S.D.N.Y. 2013); Richard C. Reilly, Practice Commentaries, McKinney's Cons. Laws of N.Y., Book 7B, C5501:10 (2014) ("[P]ractitioners should note that the reference to cases in which an itemized verdict is required by CPLR 4111 appears to restrict the operation of the 1986 amendment to 5501(c) to the tort case. The tort case, however, is the traditional context of the excess verdict problem"). Prior to the 1986 codification of § 5501(c), New York courts "would not disturb an award unless the amount was so exorbitant that it 'shocked the conscience of the court.'" *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 422 (1996). Federal courts apply the same standard. *See id.* In determining whether a verdict shocks the conscience, "courts have reviewed awards in other cases involving similar injuries, bearing in mind that any given judgment depends on a unique set of facts and circumstances." *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993) (internal quotation marks omitted).

The Court need not decide whether the "deviates materially" or the "shocks the conscience" standard applies here because the result is the same. Although Defendants identify no comparable New York cases establishing that the jury's verdict of $750,000 was excessive (and the Court has located none), *see Consorti*, 103 F.3d at 5 (explaining that district court should "check the jury's verdict against the relevant New York decisions"), the Court nevertheless concludes that the award deviates materially from what is reasonable compensation, and also shocks the conscience. *See Alen MacWeeney, Inc. v. Esquire Assocs.*, 574 N.Y.S.2d 340, 341 (1st Dep't 1991) (analyzing record custom evidence and case law in determining excessiveness); *Learning Annex Holdings,*

16

*LLC v. Rich Global, LLC*, 09 Civ. 4432 (SAS), 2012 WL 2878124, at *5–6 (S.D.N.Y. July 13, 2012) (denying remittitur in quantum meruit action where verdict awarded a 33 percent commission and industry standard evidence showed typical commissions ranged between 35-40 percent).

The Court's analysis here assumes that its determination that the value of Vioni's services cannot be calculated based on market place conventions for hiring institutions is reversed or vacated. It is apparent that the jury must have included the eight PIM employees and at least one bonus in its calculation of the $750,000 award. *See* n.2–4, *supra*. Because a calculation based on the eight PIM employees and any bonus is unsupported by any evidence in the record, the award is so excessive that it deviates materially from what would be reasonable compensation, and also shocks the conscience.

As explained above, the record does not contain any evidence that Vioni was entitled to a fee based on any contingent bonus provided for in the ACAS offer letters. Nor does it contain evidence that she was entitled to a fee based on ACAS hiring the eight PIM employees. *Cf. A N Assocs., Inc. v. Quotron Sys., Inc.*, 605 N.Y.S. 2d 178, 179 (Civ. Ct. N.Y. Cnty. 1993) ("[E]mployee recruitment firms are entitled to a commission for successfully recruiting an employee if the firm is the procuring cause of the employee's placement. . . . To be the procuring cause, the [recruiter] must do more than merely bring the parties together. He must serve as the direct and proximate link between the introduction and the consummation of the transaction. She must, in effect, be the dominant force in the negotiations or the completion of the [transaction]."). Based on the record evidence, an award can only be based on Jeffrey's first-year base salary of $500,000.

Next, Niemczyk testified that the industry standard for recruiters' fees ranges between 20-

30 percent. Tr. 482. But the percent depends on what type of search is conducted. A retained search is one where the hiring institution "pays part of the fee at the outset of the search." Tr. 403. A contingent search is one where "the search firm . . . [is] not paid unless and until a candidate is hired." Tr. 475. And an opportunistic search is one where "the search firm makes an introduction outside of an authorized search." Tr. 475–76. The evidence at trial supports the conclusion that Vioni's services were in line with a contingent search: nothing suggests the introduction here was unauthorized, and Vioni was not to be paid unless a deal was consummated. While Niemczyk testified that the range for contingent searches "would be more in the 20 to 25 percent range," she did not specify that recruiters do not receive above 25 percent for contingent searches. Tr. 482 ("30 percent is more common for retained searches . . . .") The Court therefore finds that based on the record, the maximum rate that would be reasonable and not excessive is 30 percent. 30 percent of Jeffrey's first-year base salary of $500,000 is $150,000.

If the Court's conclusion that Vioni's services cannot be calculated based on market place conventions for hiring institutions is reversed or vacated, Vioni may choose between a new trial on damages or remittitur reducing the award to $150,000.

## CONCLUSION

The Court grants Defendants' JMOL motion and conditionally grants Defendants' motion for a new trial on damages or remittitur reducing the award to $150,000. The Clerk of Court is directed to enter judgment and close this case.[6]

Dated: New York, New York
August 2, 2017

SO ORDERED

*Paul A. Crotty*
PAUL A. CROTTY
United States District Judge

---

[6] The Court notes that the parties stipulated on March 13, 2017 to drop Hedge Connection, Inc. as a plaintiff and Providence Investment Partners, LLC as a defendant in this case.